*Maryland Department of the Environment v. County Commissioners of Carroll County, Maryland*
No. 5, September Term 2018

*Frederick County, Maryland v. Maryland Department of the Environment*
No. 7, September Term 2018

**Environmental Law – Administrative Law – Clean Water Act – Stormwater Discharge Permits – Impervious Surface Restoration.** The Maryland Department of the Environment may lawfully include an impervious surface restoration requirement in a municipal separate storm sewer system (MS4) discharge permit without reference to the "maximum extent practicable" standard in the federal Clean Water Act for certain pollution controls. The Department was not arbitrary or capricious in deciding to include such a provision in Frederick County's most recent MS4 permit. 33 U.S.C. §1342(p)(3)(B)(iii); Maryland Code, Environment Article, §9-322 *et seq.*

**Environmental Law – Administrative Law – Clean Water Act – Stormwater Discharge Permits – Scope of MS4 Permit.** The Maryland Department of the Environment may lawfully include an impervious surface restoration requirement in a municipal separate storm sewer system (MS4) discharge permit when that requirement is derived from commitments in the State Watershed Implementation Plan that were accepted by the federal Environmental Protection Agency (EPA) when it adopted the Chesapeake Bay TMDL, which in turn allocated pollutant reductions among various sources of pollution for the purpose of achieving water quality standards in the Chesapeake Bay, in compliance with the federal Clean Water Act. To the extent that other restoration requirements in a permit are based on pollutant reduction allocation decisions made in other EPA-approved TMDLs, any challenge to those decisions should have been made in connection with the EPA's approval of the TMDLs themselves and cannot be made as part of judicial review in State court of a permit issued by the Department. 33 U.S.C. §1342(p); Maryland Code, Environment Article, §§1-606, 9-322 *et seq.*

**Environmental Law – Administrative Law – Clean Water Act – Stormwater Discharge Permits – Classification of Phase I Jurisdictions.** The Maryland Department of the Environment had authority to treat Frederick County and Carroll County as Phase I jurisdictions for purposes of their municipal separate storm sewer system (MS4) discharge permits. It was not arbitrary or capricious for the Department to classify Carroll County as a Phase I jurisdiction without also including Washington County in that category. 33 U.S.C. §1342(p)(1)-(2); Maryland Code, Environment Article, §9-322 *et seq.*

**Environmental Law – Administrative Law – Clean Water Act – Stormwater Discharge Permits – Water Quality Trading.** A potential compliance method in a municipal separate storm sewer system (MS4) discharge permit could authorize the permittee to engage in water quality trading. Water quality trading occurs when a permittee takes credit for a pollution reduction accomplished by another entity that the permittee compensates. It was not arbitrary or capricious for the Maryland Department of the Environment to omit water quality trading from an MS4 permit until it had finally adopted regulations that it had proposed concerning that compliance method. 33 U.S.C. §1342(p); Maryland Code, Environment Article, §9-322 *et seq.*


**Environmental Law – Administrative Law – Clean Water Act – Stormwater Discharge Permits – Permit Provision Related to Comprehensive Plan.** The Maryland Department of the Environment included a provision in municipal separate storm sewer system (MS4) discharge permits requiring the permittees to cooperate with other agencies during completion of the water resources element of the local comprehensive plan required by a Maryland statute. The permit provision stated that such cooperation "shall not be restricted by the responsibilities attributed to other entities by separate State statute, including but not limited to reviewing and approving plans and appropriating funds." While the language of this provision is ambiguous, it does not, and could not, transfer the responsibilities of other agencies to the permittee. 33 U.S.C. §1342(p); Maryland Code, Environment Article, §9-322 *et seq.*; Land Use Article, §3-101 *et seq.*

Circuit Court for Carroll County
Case No. 06-C-15-068141

Circuit Court for Frederick County
Case No. 10-C-15-000293

Argued: September 13, 2018

<u>IN THE COURT OF APPEALS</u>
<u>OF MARYLAND</u>

Nos. 5 & 7

September Term, 2018

MARYLAND DEPARTMENT OF THE ENVIRONMENT

V.

COUNTY COMMISSIONERS OF CARROLL COUNTY, MARYLAND

FREDERICK COUNTY, MARYLAND

V.

MARYLAND DEPARTMENT OF THE ENVIRONMENT

Barbera, C.J.,
*Greene
*Adkins
McDonald
Watts
Hotten
Getty,

JJ.

Opinion by McDonald, J.
Watts, Hotten, and Getty, JJ., dissent.

Filed: August 6, 2019

*Greene and Adkins, JJ., now retired, participated in the hearing and conference of this case while active members of this Court; after being recalled pursuant to the Maryland Constitution, Article IV, Section 3A, they also participated in the decision and adoption of this opinion.

Pursuant to Maryland Uniform Electronic Legal Materials Act
(§§ 10-1601 et seq. of the State Government Article) this document is authentic.



Suzanne C. Johnson, Clerk

In the quest to conserve a vital resource – the nation's waters – Congress has enlisted the federal, state, and local governments under the Clean Water Act ("the Act")[1] in a regulatory approach sometimes called "cooperative federalism." This effort involves a type of regulation that takes the form of a "permit" issued by a federal agency (or a state agency with federal oversight) at specified intervals to the regulated entity. Such permits authorize discharges of pollution into waterways, which the Act otherwise prohibits. When the targeted pollution is in stormwater, the permittee – *i.e.*, the regulated entity – is often a local government. Inevitably, as in any assignment of responsibility for solving a serious problem, there is disagreement as to the solution and the allocation of that responsibility. One way to resolve such disputes is through judicial review of the permit.

This consolidated appeal concerns judicial review of the most recent permits issued to Carroll County and Frederick County ("the Counties") under the Act and a parallel Maryland regulatory scheme. The permits regulate the discharge of polluted stormwater into waterways in the Chesapeake Bay watershed. The permits were developed and issued by the Maryland Department of the Environment ("Department") under the supervision of the United States Environmental Protection Agency ("EPA"), as part of an EPA-led, multi-state effort to restore the Chesapeake Bay in compliance with the Act.

---

[1] 33 U.S.C. §1251 through §1388.

Both Counties raise serious issues concerning the scope of the permits, the level of effort required of each County, the classification of the Counties (which affects certain conditions in the permits), and the absence or inclusion of certain terms in the permits. Ultimately, we hold that the Department did not exceed its authority under State and federal law when it issued the permits, nor did it act arbitrarily or capriciously in including the challenged terms in the permits.

# I

## Background

### A.  *The Clean Water Act and Stormwater Controls for the Chesapeake Bay*

The Chesapeake Bay lies between the western and eastern shores of Maryland and Virginia.  As a recent federal court opinion has noted, its name derives from the Algonquin word for "great shellfish bay."  *Norfolk Southern Railway Co. v. City of Roanoke*, 916 F.3d 315, 323 (4th Cir. 2019) (Wilkinson, J., concurring).  While the Bay once hosted a quantity of fish and shellfish described as "unbelievable, ... indescribable, and ... incomprehensible," that is no longer the case and "[i]nstead of fish, we quantify phosphorus, nitrogen, sediment, and other pollutants" that threaten the health of the Bay's marine life.  *Id.*

The watershed of the Chesapeake Bay – the land from which water drains into it – covers about 64,000 square miles in six states and the District of Columbia ("the Bay States"), and extends from Cooperstown, New York, to Norfolk, Virginia.  Pollution from that region contaminates the waters that feed the Bay and ultimately the Bay itself.  "Restoring damaged waters like the Chesapeake Bay requires sustained effort, entailing

2

cooperation and coordination among the federal government, state and local governments, the enterprise of the private sector, and all the people who make this region their home." *Norfolk Southern*, 916 F.3d at 323 (internal quotation marks and citation omitted).

Federal, state, and local governments have spent decades devising programs to reduce the pollution that enters the Bay. This appeal concerns one such program. In any effort to describe a complex regulatory regime, overseen by various government agencies, one inevitably must become familiar with the concepts, jargon, and acronyms that define that effort. We begin with an overview of the key elements pertinent to this appeal.

*Where Pollutants Come From – Point and Nonpoint Sources*

An important distinction for purposes of the Clean Water Act is the difference between "point sources" and "nonpoint sources" of water pollution. Point sources are discrete and localized, like a pipe carrying discharges from a factory or wastewater treatment plant.[2] Nonpoint source pollution, by contrast, comes from dispersed areas like farms or fields where water runs off the land without being collected or channeled into a point source.[3] This distinction matters for purposes of the Act because the federal statute regulates point sources of water pollution but does not directly regulate nonpoint sources.

---

[2] A "point source" is defined as "any discernible, confined and discrete conveyance, including but not limited to any pipe, ditch, channel, [or other types of conveyance], from which pollutants are or may be discharged." 33 U.S.C. §1362(14).

[3] "Nonpoint source" is not defined in the Act. The EPA regards a "nonpoint source" as "any source of water pollution that does not meet the legal definition of 'point source' in [the Act]." *See* EPA, *Basic Information about Nonpoint Source (NPS) Pollution*, https://perma.cc/QPW5-LADC.

*Discharge Permits*

The Act generally prohibits "any person"[4] from discharging pollutants from a point source into a waterway.[5] 33 U.S.C. §1311(a). Accordingly, the statute requires a permit for the discharge of pollutants into a water body from a point source under specified conditions. The Act establishes the National Pollution Discharge Elimination System ("NPDES") to govern such permits. 33 U.S.C. §1342. The EPA is authorized to issue and enforce these permits. 33 U.S.C. §§1319, 1342(a)(1). The EPA may also delegate that authority to a state so long as the state's law establishes a parallel permitting program consistent with the Act. 33 U.S.C. §1342(b). The EPA has delegated such authority to most states, including Maryland.[6]

Each discharge permit in Maryland is issued under the Act and under a parallel State program. *See* Maryland Code, Environment Article ("EN"), §9-322 *et seq.*; COMAR 26.08.04.07. Under Maryland law, the Department is the agency designated to issue and enforce these permits. EN §9-253; COMAR 26.08.04.01. Permits are generally issued for fixed terms of five years or less, subject to renewal. *See* 33 U.S.C. §1342(b)(1)(B); EN

---

[4] Under the Act, "person" includes "an individual, corporation, partnership, association, State, municipality, commission, or political subdivision of a State, or any interstate body." 33 U.S.C. §1362(5).

[5] "Discharge of a pollutant" means "any addition of any pollutant to navigable waters from any point source [or] any addition of any pollutant to the waters of the contiguous zone or the ocean from any point source other than a vessel or other floating craft." 33 U.S.C. §1362(12).

[6] *See* EPA, *NPDES Permits Around the Nation*, https://perma.cc/2VF2-C7MK.

4

§9-328(b).  As a general rule, the Act prohibits subsequent permits from containing "less stringent" conditions than the conditions in the previous permit – sometimes referred to as the "anti-backsliding prohibition" in the Act.  33 U.S.C. §1342(o).

The Act does not require permits for nonpoint sources or otherwise directly regulate them.  Accordingly, the EPA does not regulate those sources of water pollution.  States may do so through their own regulatory programs, as Maryland has done.[7]  The Act authorizes federal grants to assist the states in such efforts.  33 U.S.C. §1288.

*Pollution Controls in Permits – Water Quality Standards and Effluent Limitations*

Under the Act, "water quality standards" are the benchmark for clean water.  For each water body covered by the Act, states submit water quality standards to the EPA for review and approval.[8]  The standards are to be based on the water body's "designated use" (*e.g.*, public water supply, fishing, recreational use) and include criteria necessary to support that use (*e.g.*, specific limits on certain pollutant concentrations).  *See* 33 U.S.C. §1313(c)(2)(A); 40 CFR §§130.3, 131.6; COMAR 26.08.02.01-.03.

---

[7] The State relies on a "wide array of nonpoint source pollution control programs [to combat] these varied pollution sources."  Maryland Department of the Environment, *Nonpoint Source Program (319) Management and Financial Assistance*, https://perma.cc/X6ZV-6T5E.  Such programs include septic system upgrades, erosion and sediment control on farms, fertilizer application management, and many others.  *See* Maryland Department of the Environment, *Maryland's 2015-2019 Nonpoint Source Management Plan* (updated August 4, 2016), *available at* https://perma.cc/RR5K-6EMB.

[8] If the EPA does not approve a state-authored water quality standard, the EPA must establish the standard itself.  33 U.S.C. §1313(c)(4).

To achieve water quality standards, the Act requires that discharge permits include pollution controls for point sources. 33 U.S.C. §1311(b). The Act calls these controls "effluent limitations" – "effluent" being the material discharged by a point source.[9] Effluent limitations may be "technology based" or "water quality based." *See* EPA, *NPDES Permit Limits*, https://perma.cc/L4G6-24K9; *Natural Resources Defense Council v. EPA*, 808 F.3d 556, 563 (2d Cir. 2015).

Technology based effluent limitations are generally the first round of controls in the effort to achieve water quality standards. *See* 33 U.S.C. §1311(b)(1)(A). They "represent the minimum level of control that must be imposed in a permit[.]" 40 CFR §125.3(a). But even the most stringent technology based effluent limitations have not achieved water quality standards in thousands of the nation's waterways.[10] Congress anticipated this possibility in 1972 by retaining water quality standards "as a supplementary basis for effluent limitations … so that numerous point sources, despite individual compliance with effluent limitations, may be further regulated to prevent water quality from falling below acceptable levels." *EPA v. California ex rel. State Water Resources Control Board*, 426 U.S. 200, 205 n.12 (1976). If technology based limitations do not achieve the water quality

---

[9] The term "effluent" is not defined in the Act. However, the Act defines "effluent limitation" as "any restriction established by a State or the [EPA] on quantities, rates, and concentrations of chemical, physical, biological, and other constituents which are discharged from point sources into navigable waters, the waters of the contiguous zone, or the ocean, including schedules of compliance." 33 U.S.C. §1362(11).

[10] *See American Farm Bureau Federation v. EPA*, 792 F.3d 281, 289-91 (3d Cir. 2015).

standards, permits may include "any more stringent limitation ... necessary to meet water quality standards" – *i.e.*, "water quality based effluent limitations." 33 U.S.C. §1311(b)(1)(C); 40 CFR §130.7(c).[11]  Thus, regardless of whether a waterway is over-polluted due to point sources, nonpoint sources, or some mixture of both, the Act authorizes the imposition of water quality based controls on point sources, in addition to the most stringent technology based controls.[12]

These two types of effluent limitations differ in their reference point and in their strategies for reducing pollution.[13]  For technology based limitations, the reference point is the source, and the strategy is to deploy pollutant-reducing technology at that source regardless of its contribution of pollutants to the waterway.  By contrast, for water quality based effluent limitations, the reference point is the waterway, and the strategy is for the

---

[11] *Cf.* COMAR 26.08.03.01C(2)(b) ("Best available technology shall be required as the minimum for all permitted discharges.  If it is determined that compliance with the established water quality standards will not be achieved through [best available technology], additional treatment shall be [required].").

[12] A core premise of water quality based effluent limitations in general is that permitting agencies may require point sources to go beyond their existing capabilities to achieve further pollution reductions. *See Natural Resources Defense Council v. EPA*, 915 F.2d 1314, 1316-17 (9th Cir. 1990).

[13] *See* Michael P. Healy, *Still Dirty After Twenty-Five Years: Water Quality Standard Enforcement and the Availability of Citizen Suits*, 24 Ecology L.Q. 393, 399 (1997) ("Technology-based standards are based on the source's technological capacity to control pollution, while water quality-based standards are based on the environmental effect of the discharged pollution.").

point source to implement any additional actions (beyond the already required technologies) necessary to achieve the applicable water quality standard.[14]

*The Point Sources Here – Municipal Separate Storm Sewer Systems (MS4s)*

This appeal concerns permits for a type of point source known as a "municipal separate storm sewer system" ("MS4").[15] An MS4 is a network of conveyances (including storm drains, gutters, and other drainage systems) designed to carry only stormwater (as opposed to a "combined sewer system" that conveys both sanitary sewage and stormwater). 40 CFR §122.26(b)(8).

MS4s differ from typical "end-of-pipe" point sources in certain respects. A common point source, such as a pipe that discharges waste from a factory, usually discharges a known and finite set of pollutants from a specific location. By contrast, stormwater picks up various pollutants as it flows across widely dispersed areas, including paved (or "impervious") surfaces, on its way to one of the many conveyances that make up an MS4, and then into a waterway. The quantity of stormwater that flows through these

---

[14] *See* EPA, *NPDES Permit Writer's Manual* (September 2010) ("EPA Permit Writer's Manual"), *available at* https://perma.cc/P8BX-MNUY, at 5-1 (Technology based effluent limitations "are developed independently of the potential impact of a discharge on the receiving water, which is addressed through water quality standards and water quality-based effluent limitations[.]").

[15] Shortly after the passage of the Clean Water Act in the 1970s, the question of whether – and if so, how – to treat MS4s as point sources under the Act generated regulations and litigation. The EPA initially adopted regulations exempting MS4s from the Act's permit requirement. That exemption was challenged and held invalid in *Natural Resources Defense Council v. Costle*, 568 F.2d 1369, 1372-73 (D.C. Cir. 1977). Ultimately, Congress enacted the Water Quality Act of 1987, which explicitly established a discharge permit requirement for MS4s. *See* 33 U.S.C. §1342(p).

conveyances into a waterway can vary unpredictably depending on the weather, any development of the land (*e.g.*, whether the land is paved), and other activities on the land (*e.g.*, litter, use of lawn fertilizers).

Given these differences between an MS4 and a typical point source like a factory, a discharge permit for an MS4 differs from that for a typical point source. A discharge permit for a typical end-of-pipe point source usually sets numeric limits as effluent limitations for the known set of pollutants discharged from that pipe.[16] Using that same approach for an MS4 would entail setting effluent limitations for each conveyance within the stormwater drainage system, which would be administratively, technically, and financially burdensome.[17] Instead, an MS4 permit generally requires the permittee to implement flexible management programs designed to reduce the pollution introduced into

---

[16] EPA Permit Writer's Manual, *supra* note 14, Ch. 5 (explaining in detail a permitting agency's process for developing technology based effluent limitations); *Natural Resources Defense Council v. EPA*, 808 F.3d 556, 567 (2d Cir. 2015) (A discharge permit imposes effluent limitations on a point source "based on how much technology is able to reduce the amount of a pollutant at issue").

[17] *See* EPA, *National Pollutant Discharge Elimination System Permit Application Regulations for Storm Water Discharges*, 55 Fed. Reg. 47990, 48037-38 (November 16, 1990) ("EPA Preamble to 1990 Phase I MS4 Rule"). The discussion of the background of the regulations that appears together with the notice announcing the EPA's final adoption of the regulations is sometimes informally referred to as a "preamble" to the regulations. However, it is not itself part of the regulations and does not appear in the Code of Federal Regulations. *See* James T. O'Reilly, Administrative Rulemaking §10:1 (2019 ed.).

stormwater, thereby limiting the amount of pollution discharged into the waterway.[18]  In the language of the Act, an MS4 permit is to include "controls to reduce the discharge of pollutants to the maximum extent practicable, including management practices, control techniques and system, design and engineering methods, and such other provisions as the [EPA] or the State determines appropriate for the control of such pollutants."  33 U.S.C. §1342(p)(3)(B)(iii).

*Implementation of the MS4 Permit Requirement – Phase I and Phase II*

The Act and related EPA regulations have applied the permit requirement to MS4s in two phases.  The first phase ("Phase I") took effect during the period 1987-94 and included stormwater systems that were serving more heavily populated areas – dubbed "large" and "medium" MS4s – and those that were contributing to the failure of a water body to meet water quality standards, irrespective of the size of the population served.  *See* 33 U.S.C. §1342(p)(2); 40 CFR §122.26(b).  Subsequently, a second phase ("Phase II") covered "small" MS4s.  *See* 33 U.S.C. §1342(p)(5)-(6); 40 CFR §122.34.  As a general rule, permits for MS4s included in Phase I have been subject to an earlier timetable and more stringent conditions than permits for MS4s included in Phase II.

---

[18] *See* EPA Preamble to 1990 Phase I MS4 Rule, 55 Fed. Reg. at 48037-38; *Natural Resources Defense Council v. New York State Dep't of Envtl. Conservation*, 34 N.E.3d 782, 787 (N.Y. 2015).

10

*Total Maximum Daily Load (TMDL)*

An important element in determining the conditions that appear in a discharge permit is what is known as the "total maximum daily load" – or "TMDL." The Clean Water Act does not define this phrase, but describes it as the "level" of a pollutant that a water body can tolerate without violating applicable water quality standards. 33 U.S.C. §1313(d)(1)(C). In practice, the acronym "TMDL" has come to refer to more than just a numeric measure of a pollutant. It has also come to refer to the process and calculations used to determine that level of a pollutant and its allocation among sources of the pollutant. The document in which an agency calculates the TMDL, in the sense of a numeric measure of a pollutant, and allocates that level among various sources of pollution is also sometimes referred to as a "TMDL." A singularly complex example pertinent to this case is what is referred to as the Chesapeake Bay TMDL ("Bay TMDL"),[19] which is discussed in greater detail below.

The EPA has elaborated on the meaning of TMDL as a numeric measure of pollution in its regulations. The term "load" refers to a measure of water pollution. *See* 40 CFR §130.2(e) (defining "load" as "[a]n amount of matter or thermal energy that is introduced into a receiving water"). The phrase "total maximum daily load" or "TMDL" is defined in regulation as "the sum of" amounts of the relevant pollutant emanating from various point and nonpoint sources together with a "natural background" amount of the pollutant and a

_____

[19] EPA, *Chesapeake Bay Total Maximum Daily Load for Nitrogen, Phosphorus and Sediment* (December 29, 2010), *available at* https://perma.cc/RWM2-Y22N.

11

"margin of safety." 40 CFR §§130.2(i), 130.7(c)(1). A TMDL, in this sense, "can be expressed in terms of either mass per time, toxicity, or other appropriate measure…." 40 CFR §130.2(i). To understand this definition of TMDL as a numeric measure requires an understanding of the TMDL process.

The TMDL process is based on the direction in the Act that each state identify waterways for which technology based effluent limitations are not achieving water quality standards.[20] 33 U.S.C. §1313(d)(1)(A). If water quality standards are not being met in a waterway due to excess levels of a particular pollutant, the state is to determine the maximum amount of that pollutant that the waterway can receive without violating water quality standards – *i.e.*, the TMDL for that pollutant as to that waterway. 33 U.S.C. §1313(d)(1)(C). The resulting TMDL – as a cap on the pollutant – is sometimes referred to as a "pollution budget" or "pollution diet." *E.g.*, *Norfolk Southern*, 916 F.3d at 324; *Conservation Law Foundation v. EPA*, 964 F. Supp. 2d 175, 179 (D. Mass. 2013).

The EPA's regulations recognize that, in order for a state to calculate the maximum level of a pollutant that a waterway can tolerate without violating water quality standards, a state agency must conduct a complex scientific analysis. The state agency must consider, among other things, the relationship between the water quality standards and the level of the pollutant in the waterway, the various sources of the pollutant, and the extent to which

---

[20] As indicated above, when technology based effluent limitations are inadequate to achieve water quality standards, discharge permits may include water quality based effluent limitations.

each source contributes to the violation of water quality standards. *See* 40 CFR §130.7(c). As indicated earlier, in developing the TMDL for that pollutant, the agency must also factor in "seasonal variations and a margin of safety which takes into account any lack of knowledge concerning the relationship between effluent limitations and water quality." 33 U.S.C. §1313(d)(1)(C).

Once the agency produces its best estimate of the maximum pollutant level consistent with water quality standards – *i.e.*, the TMDL in the sense of a numeric measure of pollution – it must then apportion that amount to the relevant sources of that pollution while allowing for the margin of safety required by the Act. *See* 40 CFR §§130.2(i), 130.7(c). The portion assigned to each relevant point source is called a "wasteload allocation." 40 CFR §130.2(h). The portion assigned to each nonpoint source is called a "load allocation." 40 CFR §130.2(g). In all, therefore, the TMDL – in the sense of a numeric amount – for a given pollutant for a particular waterway is the sum of the wasteload allocations, the load allocations, the natural background, and the margin of safety. 40 CFR §§130.2(i), 130.7(c)(1). After a state has determined a TMDL for a particular pollutant with respect to a particular waterway, it is to be submitted to the EPA for approval. 33 U.S.C. §1313(d)(2).

When a state submits a TMDL to the EPA, the state provides not only the maximum pollutant amount, but also the various wasteload allocations and load allocations, together with an explanation of the calculations that resulted in that maximum amount and the allocations. EPA, *Water Quality Planning and Management*, 50 Fed. Reg. 1774, 1775 (January 11, 1985) ("it is impossible to evaluate whether a TMDL is technically sound and

13

whether it will be able to achieve [water quality] standards without evaluating component [wasteload and load allocations] and how these loads were calculated"). As indicated earlier, an example of a document that contains the separate TMDLs (in the sense of numeric amounts) for relevant pollutants, explains the reasoning and calculations underlying those caps, and allocates those totals among the relevant sources of pollution is the Bay TMDL.

A TMDL such as the Bay TMDL is neither self-implementing nor directly enforceable. Rather, it serves as an informational tool that the EPA and the states use in seeking to achieve the specified pollutant levels – and the applicable water quality standards – by means of discharge permits and other regulatory tools. *See American Farm Bureau Federation v. EPA*, 984 F. Supp. 2d 289, 297-98 (M.D. Pa. 2013), *aff'd*, 792 F.3d 281 (3d Cir. 2015). To enforce the TMDL limits and corresponding water quality standards, agencies that issue discharge permits seek to ensure that the total pollution discharged by point sources does not exceed the wasteload allocations in the relevant TMDLs. The combined pollution allotted to all of the point sources should equal the sum of the wasteload allocations in a TMDL. Therefore, the discharge permit for each point source is to contain water quality based effluent limitations consistent with the "assumptions and requirements" of the wasteload allocation for that source in any applicable TMDL. 40 CFR §122.44(d)(1)(vii)(B).

A discharge permit may incorporate provisions related to several TMDLs. The permits at issue in this case incorporate provisions not only from the Bay TMDL, but also from TMDLs, developed by the Department and approved by the EPA, for certain

14

waterways.[21]   Appendices to the Counties' MS4 permits list the approved TMDLs applicable to each County.  One example, which will be discussed later in this opinion, is the TMDL for fecal bacteria in Double Pipe Creek, whose watershed spans both Counties.

*Chesapeake Bay TMDL and Maryland Watershed Implementation Plan (WIP)*

In 2009, after decades of multilateral efforts aimed at restoring the Chesapeake Bay,[22] the EPA began the development of a Chesapeake Bay-wide TMDL.[23]   After publishing a draft for a period of public review, the EPA adopted the Bay TMDL in late 2010.[24]  The Bay TMDL establishes limits for three pollutants – nitrogen, phosphorus, and sediment – that threaten marine life by feeding large algae blooms that block sunlight and

---

[21]  *See* Maryland Department of the Environment, *Approved TMDLs*, https://perma.cc/99S9-C7Q3.

[22] For a summary of Bay clean-up efforts over the past several decades, *see Farm Bureau*, 984 F. Supp. 2d at 298-303.

[23] The EPA "established the Chesapeake Bay TMDL pursuant to a number of existing authorities, including the [Clean Water Act] and its implementing regulations, judicial consent decrees requiring EPA to address certain [waters in the Chesapeake Bay watershed that were failing to meet water quality standards], a settlement agreement resolving litigation brought by the Chesapeake Bay Foundation, the 2000 Chesapeake Agreement [between certain Bay states], and Executive Order 13508." *See* Bay TMDL at 1-16.  That Executive Order directed the EPA to "mak[e] full use of its [Clean Water Act] authorities to lead a collaborative and effective federal and state effort to meet the Bay's nutrient and sediment goals." *Id.* at 1-17.

[24] *See* EPA, *Clean Water Act Section 303(d):  Preliminary Notice of Total Maximum Daily Load (TMDL) Development for the Chesapeake Bay*, 74 Fed. Reg. 47792 (September 17, 2009); EPA, *Clean Water Act Section 303(d): Notice for the Establishment of the Total Maximum Daily Load (TMDL) for the Chesapeake Bay*, 76 Fed. Reg. 549 (January 5, 2011) (stating that the EPA established the Bay TMDL on December 29, 2010).

reduce oxygen levels in the water.[25]  Bay TMDL at 2-6, 2-7.  Specifically, the Bay TMDL

pollutant caps are designed to satisfy water quality standards involving "aquatic life uses"

and criteria such as water clarity and dissolved oxygen levels.  *Id.* at 3-1, 3-2.

Given the breadth and complexity of the Bay TMDL, the EPA established a unique

accountability framework to achieve its goals.  Bay TMDL at ES-8.  Although the Act

generally does not require an implementation plan for a TMDL, the EPA directed each Bay

State to create a "Watershed Implementation Plan" ("WIP") to reduce pollution to the

levels set by the Bay TMDL.  Each Bay State's WIP serves two basic purposes – to break

down the EPA's statewide Bay TMDL pollutant allocations among geographic areas and

among point and nonpoint sources within the state, and to identify the programs and

policies that the state will use to achieve those pollutant reductions.  The Maryland WIP

was developed by the Department together with the Departments of Planning, Agriculture,

and Natural Resources.  Maryland's Final Phase I Watershed Implementation Plan (Dec.

3, 2010), *available at* https://perma.cc/8CMV-ENCB ("Maryland WIP").[26]  Like the other

---

[25] More precisely, the Bay TMDL divides waterways in the Chesapeake Bay watershed into 92 "segments," and establishes individual TMDLs – in the sense of numeric amounts – for each segment for each of the three pollutants.  Thus, the Bay TMDL is "an assemblage of 276 TMDLs:   individual TMDLs for each of the 3 pollutants – nitrogen, phosphorus, and sediment – for each of the 92 segments (3 x 92 = 276)."  Bay TMDL, at xiii & 2-7.

[26] The EPA anticipated that each state would write its WIP in three phases.  The State has published the first two iterations of its WIP and a draft version of the third iteration.  *See* Maryland Department of the Environment, *Watershed Implementation Plans*, https://perma.cc/J985-WQ65.  Citations in the text are to the first iteration of the WIP, often referred to as the Phase I WIP.  The "phases" of the WIP should not be confused

16

Bay State WIPs, the Maryland WIP functions as a "roadmap" for how and when the State will reach the pollution reduction goals set forth in the Bay TMDL. *Maryland Department of the Environment v. Anacostia Riverkeeper*, 447 Md. 88, 109 (2016).

*Implementing the Maryland WIP in MS4 Permits*

The Maryland WIP listed several requirements to be included in the then-upcoming round of Phase I MS4 permits in Maryland. Two of these requirements correspond to terms in the Counties' permits that are part of the dispute in this litigation.

First, a commitment in the Maryland WIP involves restoration of impervious surfaces – *i.e.*, areas that have been paved or otherwise developed, as opposed to natural, undeveloped areas. Natural areas allow stormwater to soak into the ground, where pollutants are filtered to some extent. Impervious surfaces prevent that filtration process. Instead, stormwater that encounters an impervious surface rushes over it, collecting pollutants along the way. To "restore" an impervious surface is to make it function more like a natural terrain that absorbs and filters rain water. Doing so accomplishes the same end as a direct pollutant control, like a filter or other cleansing mechanism attached to a conveyance. The less impervious surface that exists, the less polluted stormwater will run across it and into the conveyances of the MS4. Thus, as is true in general for stormwater management programs in MS4 permits, an impervious surface restoration requirement serves as a surrogate for direct pollution controls. *See Anacostia Riverkeeper*, 447 Md. at

---

with the two phases of the MS4 permitting program, which will be discussed in some detail in Part II.D. of this Opinion.

17

122-23. The Maryland WIP called for "[c]ompletion of restoration efforts for twenty percent of the [Phase I MS4] counties' impervious surface area that is not already restored to the maximum extent practicable." Maryland WIP at 5-30.

Second, another provision of the Maryland WIP refers to many applicable local TMDLs with stormwater wasteload allocations. For example, for the Counties, the relevant local TMDLs are compiled, as mentioned above, in appendices to their MS4 permits. The Maryland WIP requires the creation of "[s]tormwater watershed implementation plans for each EPA approved stormwater wasteload allocation" in the relevant local TMDLs. Maryland WIP at 5-30. Such local watershed implementation plans are distinct from the overall Maryland WIP.

*Maryland Stormwater Management Act*

In addition to the permitting program, the State Stormwater Management Act has, since the mid-1980s, required local jurisdictions to implement stormwater management programs "to reduce as nearly as possible the adverse effects of stormwater runoff." EN §4-201. Each county and municipality is to adopt ordinances necessary to implement such a program consistent with State law. EN §4-202. The Legislature directed the Department to adopt regulations governing such programs that would, among other things, indicate that the primary goal is "to maintain after development, as nearly as possible, the predevelopment runoff characteristics." EN §4-203(b)(1); *see also Anacostia Riverkeeper*, 447 Md. at 110-13. The statute authorizes jurisdictions to impose and collect stormwater remediation fees and other charges to carry out such programs. EN §§4-202.1, 4-204; *see also* 96 *Opinions of the Attorney General* 61 (2011). Such fees provide "important revenue

needed to offset the costs of building and maintaining municipal gutters and drains, monitoring pollution levels, policing illegal discharges of polluted water, and educating the public on proper environmental practices." *Norfolk Southern*, 916 F.3d at 325 (referring to similar local stormwater fee in Virginia).

*The Carroll County and Frederick County MS4 Permits*

The Department first issued MS4 permits to Carroll County and Frederick County during the 1990s as part of Phase I of the MS4 permitting process, and has renewed those permits several times since then. The permits that are the subject of this case are Carroll County's fourth and Frederick County's third round of MS4 permits, which were both issued in December 2014. In accordance with State law, the Department first issued draft permits for public comment. *See* EN §1-604(a). In each case, the Department held a public hearing and accepted comments on the draft permit. After considering those comments, the Department made a Final Determination to issue each permit together with a document entitled "Basis for Final Determination" that provided an explanation for its action. EN §1-604(b).

Pertinent to this case, the Maryland WIP commitment involving impervious surface restoration is incorporated into Part IV.E.2.a of each permit. This provision has two components. First, it requires each County to submit to the Department an "impervious surface area assessment" consistent with guidelines provided by the Department. That assessment, if approved by the Department, "shall serve as the baseline for the restoration efforts" required by the permit. Second, by the end of the permit term, each County "shall commence and complete the implementation of restoration efforts for twenty percent of

19

the County's impervious surface area consistent with the methodology described in [a Department guidance document] that has not already been restored to the" maximum extent practicable.

Part IV.E.2.b of each permit includes a provision based on the commitment in the Maryland WIP concerning local TMDLs. This provision requires each County to submit to the Department for approval a plan to implement each stormwater wasteload allocation in each relevant, EPA-approved local TMDL. Each plan must include a final date for "meeting applicable [wasteload allocations] and a detailed schedule for implementing all [necessary] structural and nonstructural water quality improvement projects, enhanced stormwater management programs, and alternative stormwater control initiatives." Upon approval by the Department, the plans become enforceable conditions of the permits.

Two other aspects of the permits are at issue here. The first is Part VI.B of each permit, which requires the Counties to cooperate with other State agencies in the development of elements of the Counties' comprehensive growth plans that involve stormwater management. The second contested aspect of the permits is the absence of an authorization for "water quality trading."[27] As relevant here, such trading would allow the Counties to earn credit for pollution reduction by paying others (whether point or nonpoint sources) to take pollution-reducing actions. A County might consider water quality trading

---

[27] "Water quality trading" is sometimes referred to as "nutrient trading."

20

in situations where paying another party to achieve a pollution reduction costs less than the County's own efforts to achieve a similar reduction.

## B.      *Procedural History*

In January 2015, Carroll County sought judicial review of its 2014 MS4 permit in the Circuit Court for Carroll County. At the request of the parties, the matter was stayed for more than a year while the parties pursued settlement and while challenges to similar permits by environmental advocates were being litigated.[28] After the stay expired, the Circuit Court issued an opinion dated June 26, 2017, agreeing with the County on some of its claims and with the Department on others. The court remanded the County's permit to the Department. The Department appealed that ruling and the County filed a cross-appeal.

In January 2015, Frederick County sought judicial review of its 2014 permit in the Circuit Court for Frederick County. As in the Carroll County case, the matter was stayed pending settlement discussions and other litigation. After the stay expired, the Circuit Court issued an opinion dated July 14, 2017, that largely rejected the County's arguments, but remanded the permit to the Department to address what the court believed were ambiguities and inconsistencies in the permit's wording. Frederick County appealed that ruling.

The Court of Special Appeals consolidated the two appeals for argument. Prior to argument and decision in the Court of Special Appeals, the Counties asked this Court to

---

[28] This Court resolved that litigation in *Maryland Department of the Environment v. Anacostia Riverkeeper*, 447 Md. 88 (2016).

grant a writ of *certiorari* in their respective cases. The Department agreed that the Counties' petitions should be granted. This Court granted the two petitions and consolidated the cases for argument.

## II

## Discussion

Both Counties challenge conditions set forth in their most recent MS4 permits, although some of the bases for their challenges differ.

Two of the alleged flaws in the permits concern the impervious surface restoration requirement. First, Frederick County argues that the Department exceeded its authority under the Clean Water Act by failing to consider "practicability" when it included the impervious surface restoration requirement in its permit. Frederick County bases this argument on a provision of the Act that requires MS4 permits to include controls to reduce pollution discharges "to the maximum extent practicable" – what is sometimes called the MEP standard. Frederick County further argues that, even if the Act allows the Department to set the restoration requirement without regard to the MEP standard, the Department arbitrarily and capriciously failed to consider the County's contention that compliance with the degree of restoration required by the permit is impossible.

Second, both Counties assert that the Department exceeded its authority under the Act by including in the permit an impervious surface restoration requirement in which the baseline for measuring compliance with the requirement relates to the unrestored impervious surface throughout the *entire* County, rather than only the area served by the County's MS4.

Both Counties argue that the Department has unlawfully treated them as Phase I jurisdictions for purposes of their MS4 permits – thereby subjecting them to more stringent permit terms required of Phase I jurisdictions than those later required of Phase II jurisdictions – because it incorrectly classified them in the early 1990s as "medium" jurisdictions based on population. Carroll County also argues that its inclusion in Phase I of the MS4 permitting program was arbitrary and capricious.

Both Counties argue that the Department arbitrarily and capriciously failed to include water quality trading as a compliance mechanism in their permits.

Finally, Carroll County argues that a provision in its permit that requires the County to cooperate with other State agencies in the development of stormwater-related aspects of the County's comprehensive growth plan unlawfully imposes new obligations on the County.

We first discuss the standards that govern our consideration of these arguments. We then consider the substantive issues raised by the Counties.

## A.    *What and How We Review*

The General Assembly has provided for judicial review of permits issued by the Department, such as the MS4 permits issued to the Counties. EN §1-601(a)(3), (c). Such review is based on an administrative record that includes the various items set forth in EN §1-606(c).[29]  Judicial review begins in the circuit court pursuant to the Maryland Rules.

---

[29] Among other things, the record may include the permit application and any accompanying data, documents contained in the supporting file for the draft permit, comments submitted to the Department from the public, responses to those comments, the

23

*See* Maryland Rule 7-201 *et seq*. (governing judicial review of administrative actions when a statute provides for judicial review).

In an appeal of the circuit court's review of an agency action, an appellate court reviews the agency's action itself rather than the decision of the circuit court. *Hollingsworth v. Severstal Sparrows Point, LLC*, 448 Md. 648, 654 (2016). Thus, while the circuit court decisions here set the stage for our review and determined who would be appellant and appellee in our Court, we are not assessing the merits of those court decisions. Rather, we directly review the permits in light of the issues raised by the Counties.

1.      Standards for Review of Discharge Permits

*a.      General Standards for Review of Agency Action*

The standards for judicial review of a discharge permit – and their corresponding levels of deference to the agency – vary depending on whether the court is reviewing an agency's fact findings, discretionary decisions, or legal conclusions. *See Anacostia Riverkeeper*, 447 Md. at 118-21.

*Review of Fact Findings*

For fact findings, a reviewing court applies the "substantial evidence" standard, under which the court defers to the facts found and inferences drawn by the agency when the record supports those findings and inferences. *Anacostia Riverkeeper*, 447 Md. at 120.

---

tape or transcript of any public hearings, and the Department's statement of the basis for its determinations with respect to the permit.

In particular, with respect to factual issues that involve scientific matters within an agency's area of technical expertise, the agency is entitled to "great deference." *Id.*

*Review of Matters Committed to the Agency's Discretion*

With respect to matters committed to agency discretion, a reviewing court applies the "arbitrary and capricious" standard of review, which is "extremely deferential" to the agency. *Harvey v. Marshall*, 389 Md. 243, 296-99 (2005); *Spencer v. Md. State Bd. of Pharmacy*, 380 Md. 515, 529 (2004). This standard is highly contextual, but generally the question is whether the agency exercised its discretion "unreasonably or without a rational basis." *Harvey*, 389 Md. at 297; Arnold Rochvarg, Maryland Administrative Law, §4.38 at 128 (2011).

For guidance, a reviewing court may look to case law applying the similar standard in federal administrative law. *See Anacostia Riverkeeper*, 447 Md. at 120-21; *Office of People's Counsel v. Public Service Commission*, 461 Md. 380, 399 (2018).[30] Under this standard, a reviewing court is not to substitute its own judgment for that of the agency and should affirm decisions of "less than ideal clarity" so long as the court can reasonably

---

[30] Under the federal standard, the reviewing court may consider whether: (1) the agency's choice was rationally connected to the facts found; (2) the agency considered the relevant factors; (3) the agency made a clear error of judgment; (4) the agency relied on factors the legislature did not intend for it to consider; (5) the agency failed to consider an important aspect of the problem; (6) an explanation for the decision runs counter to the evidence; and (7) the decision is so implausible that it could not be ascribed to a difference in view or the product of agency expertise. *Office of People's Counsel*, 461 Md. at 399 n.16.

discern the agency's reasoning. *Bowman Transp., Inc. v. Arkansas-Best Freight System, Inc.*, 419 U.S. 281, 285-86 (1974).

*Review of the Agency's Legal Conclusions*

With respect to an agency's legal conclusions, a reviewing court accords the agency less deference than with respect to fact findings or discretionary decisions. *Anacostia Riverkeeper*, 447 Md. at 122. In particular, a court will not uphold an agency action that is based on an erroneous legal conclusion. *Id.* However, in construing a law that the agency has been charged to administer, the reviewing court is to give careful consideration to the agency's interpretation.

In construing a statute, a reviewing court applies the oft-stated approach to statutory construction. That is, the court seeks to ascertain legislative intent – whether that of the General Assembly or of Congress. That endeavor begins with the plain meaning of the text, keeping in mind that the plainest language is controlled by the context in which it appears. *Kaczorowski v. Mayor & City Council of Baltimore*, 309 Md. 505, 514 (1987). The legislative history of the statute may then be reviewed to understand the purpose of the legislation, resolve ambiguities, and confirm the apparent meaning of the text. Past case law construing a provision is, of course, also helpful. Throughout, the court must be mindful that the purpose is not to discern "purely judicial notions of public policy," but rather *legislative* intent. *BAA, PLC v. Acacia Mutual Life Ins. Co.*, 400 Md. 136, 157 (2007).

When a party challenges the agency's interpretation of the statute the agency administers, the court must assess how much weight to accord that interpretation, keeping

in mind that it is "always within [the court's] prerogative to determine whether an agency's conclusions of law are correct." *Schwartz v. Md. Dep't of Nat. Res.*, 385 Md. 534, 554 (2005). The weight given an agency's interpretation of a statute it administers depends on several factors. *Baltimore Gas & Electric Co. v. Public Service Commission*, 305 Md. 145, 161 (1986). More weight is appropriate when the interpretation resulted from a process of "reasoned elaboration" by the agency, when the agency has applied that interpretation consistently over time, or when the interpretation is the product of contested adversarial proceedings or formal rule making. *Id.* at 161-62.

b.  <u>*Effect of the Clean Water Act's Scheme of Cooperative Federalism*</u>

In our consideration of the Department's interpretation and application of the Clean Water Act, we must take into account the extent to which the EPA's administrative interpretation and federal case law set parameters for the Department's actions. The shared implementation of a federal policy or program by federal and state agencies is sometimes referred to as "cooperative federalism." *See Anacostia Riverkeeper*, 447 Md. at 101. It can affect how a state court reviews that implementation when the state agency's actions are limited by federal policies. In general, a state agency that is delegated the administration of the discharge permitting program under the Act is "bound to follow EPA's interpretation of the [Act]." *Natural Resources Defense Council v. New York State Dep't of Envtl. Conservation*, 34 N.E.3d 782, 794 n.16 (N.Y. 2015) (declining to entertain

a challenge to an EPA regulation interpreting the Act and state agency's compliance with that interpretation).[31]

Under the Act's cooperative federalism scheme, the EPA has delegated the administration of the Act's discharge permitting program in Maryland to the Department. Nonetheless, the EPA reviews and has the right to object to the Department's draft discharge permits. 40 CFR §123.44 ("EPA review of and objections to State permits"); *see also* Memorandum of Agreement between EPA and Department (May 18, 1989), *available at* https://perma.cc/3UNE-4CLN (explaining that the EPA will review all State-prepared permits and may object to them). In addition, the EPA has overseen Maryland's efforts (as well as those of the other Bay States) to achieve the goals of the Bay TMDL – *i.e.*, efforts to develop and carry out the WIPs. *See Farm Bureau*, 984 F. Supp. 2d at 323-24.

---

[31] *See also BellSouth Telecommunications, Inc. v. Sanford*, 494 F.3d 439, 449 (4th Cir. 2007) (state's authority over telecommunications issue is part of deliberately constructed model of "cooperative federalism" under which state agency applies expertise and experience "subject to the boundaries set by Congress and federal regulators"); *Perry v. Dowling*, 95 F.3d 231, 236-37 (2d Cir. 1996) (a state agency's interpretation of the federal Medicaid statute "warrants deference" when "the state has received prior federal-agency approval to implement its plan, the federal agency expressly concurs in the state's interpretation of the statute, and the interpretation is a permissible construction of the statute"); Aaron Saiger, *Chevron and Deference in State Administrative Law*, 83 Fordham L. Rev. 555, 581 (2014) ("State officials who deal with the environment, education, or antiterrorism are enmeshed in a system of regulatory federalism that often very substantially deprives them of freedom of action.").

*c.* <u>*Deference Owed to the EPA's Construction of the Clean Water Act*</u>

In assessing the weight to be accorded the EPA's construction of the Act, we look to the deference that would be accorded such interpretations under federal case law. In general, when an agency exercises authority to "make rules carrying the force of law" – *i.e.*, rulemaking, adjudications, or other actions involving similarly extensive administrative procedures – the agency's interpretation warrants deference under *Chevron U.S.A. v. Natural Resources Defense Council*, 467 U.S. 837 (1984). Less formal agency action may also merit *Chevron* deference depending on "the interstitial nature of the legal question, the related expertise of the Agency, the importance of the question to administration of the statute, the complexity of that administration, and the careful consideration the Agency has given the question over a long period of time." *Barnhart v. Walton*, 535 U.S. 212, 222 (2002).

Under *Chevron*, a federal court first determines "whether Congress has directly spoken to the precise question at issue" in the pertinent statute – in this case, the Clean Water Act. 467 U.S. at 842. If the Congressional intent is clear, the court "must give effect to [that] unambiguously expressed intent." *Id.* at 842-43. But "if the statute is silent or ambiguous with respect to the specific issue," the court must decide "whether the [EPA's] answer is based on a permissible [or reasonable] construction of the statute." *Id.* at 843-44.

Even if the particular agency interpretation does not meet the criteria for *Chevron* deference, a reviewing court may defer to that interpretation based on the persuasiveness of the agency interpretation, considering factors such as "the thoroughness evident in its

consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade, if lacking power to control." *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944) (Jackson, J.).[32]

This Court has assessed the validity of State agency actions consistent with a federal agency's regulations or interpretations of a federal statute in light of these principles. *See Anacostia Riverkeeper*, 447 Md. at 142 & n.61 (citing federal administrative deference case law and finding an EPA policy memorandum "instructive" on interpretation of federal regulation under the Clean Water Act); *Sugarloaf Citizens' Ass'n v. Department of the Environment*, 344 Md. 271, 313 (1996) (affirming Department action based in part on EPA interpretation of the federal Clean Air Act, which was entitled to deference under *Chevron*); *Koons Ford of Baltimore, Inc. v. Lobach*, 398 Md. 38, 54 (2007) (applying *Chevron* and adopting the FTC's interpretation of a federal statute that the FTC administers); *Montgomery Cty. v. Glenmont Hills Associates Privacy World at Glenmont Metro Ctr.*, 402 Md. 250, 271-72 (2007) (citing *Chevron* in adopting HUD's interpretation that a federal statute did not preempt local agency action that the Court affirmed).

---

[32] If those factors sound familiar, perhaps it is because *Skidmore* is a direct ancestor of the leading case of this Court concerning the degree of judicial deference accorded to state agency actions. *See Baltimore Gas & Electric Co. v. Public Service Commission*, 305 Md. 145, 161-62 (1986), citing and relying on *Comptroller v. John C. Louis Co.*, 285 Md. 527, 544 (1978), which cites and relies upon *Skidmore*.

2.      Reviewability of Permit Terms Derived from TMDLs and WIP

*Incorporation of TMDLs and the Maryland WIP in the Counties' MS4 Permits*

The MS4 permits at issue in this appeal incorporate or reference elements of the Bay TMDL, the Maryland WIP, and certain local TMDLs.  That raises the question whether this litigation is the appropriate forum for what amounts to a challenge to those prior administrative actions.

*The Appropriate Forum for Challenging Permit Provisions Derived from a TMDL*

Carroll County argues that provisions of a TMDL that are implemented in a permit must be reviewable in the context of judicial review of that permit – *i.e.*, in an action like this one.  The County reasons that, because Maryland statutory law does not provide for judicial review of State-authored TMDLs and because the TMDLs themselves are not self-executing, the only viable mode of judicial review is a challenge to a permit.

The County is correct that the Maryland Code does not provide for judicial review of a TMDL.  The County is also correct that a TMDL is not self-executing.  *Farm Bureau*, 792 F.3d at 291 n.4.  However, the absence of a statutory mechanism for review of a TMDL in State court does not mean it is not reviewable in any court.  The EPA's approval of a state-submitted TMDL "is an act taken pursuant to the [Clean Water Act] and thus is subject to challenge [in federal court] under the [federal Administrative Procedure Act.]" *Anacostia Riverkeeper, Inc. v. Jackson*, 798 F. Supp. 2d 210, 222 (D.D.C. 2011).  For example, the major case challenging the validity of the Bay TMDL was held to be ripe for judicial review in federal court because the "parties present[ed] a purely legal dispute on a well-developed record about the EPA's process of promulgating a TMDL." *Farm Bureau*,

31

792 F.3d at 293-94.  Similarly, parties challenging other state-prepared, EPA-approved TMDLs have obtained judicial review of the EPA's approval of those TMDLs in federal court.  *See, e.g.*, *Friends of Earth, Inc. v. EPA*, 446 F.3d 140 (D.C. Cir. 2006); *Natural Resources Defense Council v. Muszynski*, 268 F.3d 91 (2d Cir. 2001); *City of Kennett v. EPA*, 887 F.3d 424 (8th Cir. 2018).

To the extent that the Counties are challenging decisions previously made or actions taken in adopting an EPA-approved TMDL, judicial review of those decisions or actions was available in federal court.  Unsurprisingly, as this Court has previously indicated, an action for judicial review of a discharge permit in State court is not the forum for raising belated challenges to a TMDL that the challenger could have raised elsewhere.  *See Anacostia Riverkeeper*, 447 Md. at 129 n.46.[33]  Thus, in an action by a permittee under EN

---

[33] In *Anacostia Riverkeeper*, this Court cited *In re City of Moscow, Idaho*, 10 E.A.D. 135, 2001 WL 988721 (EAB July 27, 2001) to illustrate this principle.  *Moscow* was an opinion of the Environmental Appeals Board ("Board"), the EPA's final decisionmaker of administrative appeals under the statutes that the EPA administers.  In *Moscow*, a municipality pursued an administrative appeal of a discharge permit for its sewage treatment plant issued by the EPA.  The municipality challenged, among other things, a term in the permit that was derived from a state-prepared TMDL for the water body into which the plant discharged pollutants.  2001 WL 988721 at *1, *16.  The permit term established a "seasonal constraint" on phosphorus discharges (between May and October, the "normal growing season months" of algae blooms, which are fed in part by phosphorus).  *Id.* at *16 n.53.

The municipality argued, among other things, that the EPA's decision to adopt the TMDL's seasonal growth period as part of the permit was arbitrary and capricious, but the Board disagreed.  The Board observed that the TMDL clearly specified the growth period and that federal regulations required that the municipality's permit be consistent with the "assumptions and requirements" of the treatment plant's wasteload allocation established by the TMDL.  2001 WL 988721 at *16.

§1-601 challenging a permit term derived from a TMDL, the permittee may not base that

challenge on a decision that was previously made in the development of the TMDL.[34]

Consistent with the principle recognized in *Anacostia Riverkeeper*, we conclude that

claims concerning a discharge permit that are essentially challenges to a governing TMDL

and that could have been raised in an action for judicial review of the EPA's approval of

---

The municipality also claimed that the TMDL's seasonal growth period was inaccurate. The Board also rejected that argument, holding that the administrative appeal of the permit terms was not the appropriate forum for raising that claim. 2001 WL 988721 at *17. The Board reasoned that it was authorized to review "contested permit conditions" but not the validity of "prior, predicate regulatory decisions that are reviewable in other fora," and that the TMDL was a prior predicate regulatory decision reviewable in a federal district court under the federal Administrative Procedure Act. *Id.* at *18. The Board concluded that the municipality's claim was essentially a belated challenge to determinations previously made in the TMDL and the EPA's earlier decision to approve the TMDL – which were reviewable elsewhere.

As this Court indicated in *Anacostia Riverkeeper*, that reasoning applies in actions to review discharge permits in Maryland courts. In Maryland, State courts are authorized to review a discharge permit issued by the Department, but not a TMDL on which parts of the permit may be predicated. Specifically, although the General Assembly has provided for judicial review of discharge permits in EN §1-601(c), it has not authorized judicial review of State-prepared TMDLs (which are not final until they receive EPA approval). Instead, as noted in the text, the EPA's approval of such a TMDL – necessary for it to be effective – may be challenged in federal court.

[34] Of course, just because something is mentioned in a TMDL does not mean that it would be ripe for a challenge in federal court. For example, when an environmental group challenged an alleged "authorization" of water quality trading in the Bay TMDL in federal court, the court held that the claim was not ripe because the Bay TMDL only "expected" or "encouraged" trading without making a final decision about it – let alone "authorizing" it in a permit. *See Food & Water Watch v. EPA*, 5 F. Supp. 3d 62, 73-86 (D.D.C. 2013). In other words, the challenger failed to identify a final, concrete decision in the TMDL that was suitable for judicial review. That case illustrates that the principle identified in *Anacostia Riverkeeper* applies only to provisions of a TMDL that reflect a reviewable final action taken in the TMDL.

that TMDL cannot be raised in a judicial review action under EN §1-601.[35]  Accordingly, as explained further below, we will not entertain some of the Counties' arguments that are essentially challenges to provisions in EPA-approved TMDLs.[36]

## B.  *Whether the Impervious Surface Restoration Permit Term Unlawfully Exceeds the MEP Standard or is Arbitrary and Capricious*

The Clean Water Act, in describing provisions to be included in an MS4 permit, refers to a standard of "maximum extent practicable" – often denominated by the acronym "MEP."  33 U.S.C. §1342(p)(3)(B)(iii).  Whether the MEP standard governs all provisions in an MS4 permit, or only certain provisions, is a matter of debate – a debate that we shall wade into presently.  Frederick County's flagship argument in its appeal is that the Department unlawfully disregarded the MEP standard and therefore exceeded its authority when it included the impervious surface restoration requirement in the County's permit.

---

[35] We need not, and do not, address whether a State court would have authority to directly review a TMDL prepared by the Department pursuant to an administrative mandamus action, Maryland Rule 7-401 *et seq*., or otherwise.

[36] Carroll County argues that the Department is "estopped" from arguing that the County may not challenge a provision of a TMDL incorporated in its permit.  The County's basis for this argument is that, in a 2003 case, the Department successfully argued that a discharger cannot claim to have been aggrieved by a TMDL until the Department proposes to issue a discharge permit that includes effluent limitations based on the TMDL.  *See In re Wicomico River TMDL*, No. 22-C-01-000623 (Wicomico Cty. Cir. Ct. June 13, 2003).  The County's argument is not without some force as the Department's position here appears to contradict its argument in *Wicomico River*.  However, the reviewability of a permit term is a legal question, not subject to an estoppel argument.  For the reasons set forth in the text, it is our view that permit terms that directly implement a decision made in an EPA-approved TMDL are not subject to review in an action in State court challenging the permit.

The County further argues that, even if the Act allows the Department to include provisions in the permit without reference to the MEP standard, the impervious surface restoration requirement is impossible to achieve and that the Department acted arbitrarily and capriciously in including it in the permit. Carroll County does not join either of these arguments, although its permit includes an identical impervious surface restoration requirement.

1. The MEP Standard

Congress did not define the MEP standard in the Act and the EPA has explicitly declined to define it as well.[37] The phrase "*maximum* extent practicable" suggests a standard that is, or is close to, the most stringent standard in a hierarchy of possible standards under the Act. However, in the context of the Act's standards for pollution controls, that is not the case.[38] To understand why, it is helpful to review the dichotomy between technology based and water quality based effluent limitations for point sources and then consider how the MEP standard relates to those limitations.

---

[37] The EPA has explained that it "intentionally [has] not provided a precise [regulatory] definition of MEP to allow maximum flexibility in MS4 permitting." EPA, *National Pollutant Discharge Elimination System – Regulations for Revision of Water Pollution Control Program Addressing Storm Water Discharges*, 64 Fed. Reg. 68722, 68754 (December 8, 1999).

[38] *See Jones Creek Investors, LLC v. Columbia County, Ga.*, 98 F. Supp.3d 1279, 1300 n.4 (S.D. Ga. 2015) (In the MS4 context, "[t]he phrase 'maximum extent practicable' is a term of art, and should not be attributed the ordinary meaning usually applied to those words."); National Research Council, Urban Stormwater Management in the United States (The National Academies Press 2009) at 60 ("[T]he [MEP] standard for MS4s … [is] a floor, not a ceiling, for permit requirements when receiving waters are impaired.").

*The Clean Water Act's Hierarchy of Pollution Controls*

In principle, the most that a regulatory agency can require of a point source is to do what is necessary to reduce pollutants to a level such that the waterway satisfies water quality standards. Thus, the most stringent level of control – for any point source – is strict compliance with water quality standards for the pertinent waterway. Given the difficulty of calculating and enforcing such standards, Congress in the Act chose not to "make the perfect the enemy of the good" and authorized the use of technology based effluent limitations for typical, end-of-pipe point sources. 33 U.S.C. §1311(b)(1)(A). Such controls achieve some pollution reduction, although often not enough to achieve water quality standards for the pertinent waterway. As explained above, technology based effluent limitations are designed from the perspective of the discharger while controls based on water quality standards – water quality based effluent limitations – are designed from the perspective of the waterway.

*MEP Standard versus Water Quality Based Standard*

The MEP standard is analogous to a technology based effluent limitation in that its reference point is the MS4 operator rather than the waterway.[39] A water quality based effluent limitation is more stringent than an MEP-level control just as such a limitation is

---

[39] National Research Council, *supra* note 38, at 60 (grouping the MEP standard with "other technology-based requirements" for stormwater permittees); *see also Jones Creek Investors*, 98 F. Supp.3d at 1300 n.4 (MEP standard defined in the pertinent MS4 permits as "the technology-based discharge standards and controls necessary for the reduction of pollutants discharged from [an MS4]").

more stringent than a technology based control.  Despite this analogy, water quality based effluent limitations operate differently in end-of-pipe point source permits than they do in MS4 permits.  With an end-of-pipe point source, a technology based effluent limitation is typically a numeric level of pollution and the point source must install technology to ensure that the amount of pollution emitted from the pipe is below the specified level.  A water quality based effluent limitation may simply ratchet down that numeric level, requiring the point source to come up with ways to reduce pollution further.

With MS4s, however, there generally is no corresponding numeric cap on the amount of pollution discharged by each conveyance within an MS4.[40]  Instead, the MS4 operator must implement the various MEP-level management programs required by its permit.  In that context, a water quality based control is a program *in addition to* the MEP-level programs.  To say that water quality based controls are "more stringent" than or "beyond" MEP-level controls simply means that the MS4 operator must comply with the water quality based control in addition to the MEP-level controls.  For example, Frederick County's permit lists six management programs under the MEP standard.  *See* Frederick County Phase I MS4 Permit MD0068357, Part IV.D.1-6.  In addition to those programs, and under a separate section of the permit, the County is to comply with the impervious surface restoration requirement.  *Id.*, Part IV.E.2.a.

---

[40] *See Upper Missouri Waterkeeper v. Montana Dep't of Envtl. Quality*, 438 P.3d 792, 799 (Mont. 2019) (noting that MS4 permits generally have included best management practices rather than numeric limits).

37

The County and the Department appear to agree that the impervious surface restoration requirement in the County's permit is a water quality based control that is in addition to those provisions included under the MEP standard. However, the County asserts that the Department may not include such a term in the permit if it "goes beyond" the MEP standard.

2.      Whether an MS4 Permit Term May "Go Beyond" the MEP Standard

At first blush, this Court's decision in *Anacostia Riverkeeper* seems to resolve this issue in the Department's favor.[41] In a background section of that opinion, the Court stated:

> MS4s are subject to the MEP standard[.] [They] are not, however, required to [achieve] effluent limitations necessary to meet water quality standards. [But the Act] still requires Maryland to set water quality standards and TMDLs – subject to the EPA's approval. Flowing from this obligation is the requirement that MS4s are subject to effluent limitations that are consistent with [wasteload allocations] of EPA-approved TMDLs.

---

[41] The Dissenting Opinion of Judge Watts contends that the Court's holding in *Anacostia Riverkeeper* is an "obstacle" to the Department's position in this case and that the permit term in question is "incompatible" with *Anacostia Riverkeeper*. Watts Dissenting slip op. at 4-5. The Dissenting Opinion appears to have the mistaken belief that *Anacostia Riverkeeper* somehow supports Frederick County's challenge to this permit term. In fact, in that case, the Court considered a permit term that appears in Phase I MS4 permits of five other jurisdictions and that is *identical* to the permit term that Frederick County challenges here. The Court held that the term was valid and authorized by the Clean Water Act. 447 Md. at 122-26. If we were simply to recite the holding of *Anacostia Riverkeeper* and stop, Frederick County loses. But, in fairness to Frederick County and as indicated in the text, the holding in *Anacostia Riverkeeper* was in response to a challenge from a different perspective. Environmental groups argued that the permit term was inadequate to comply with the MEP standard. Here, Frederick County argues, from the opposite perspective, that the permit term unlawfully exceeds that standard. However, for the reasons explicated in the text, we disagree and reach the same outcome that *Anacostia Riverkeeper* did – that the permit term is valid and authorized by the Act.

447 Md. at 104. In other words, an MS4 permit may include, as needed, effluent limitations consistent with TMDL wasteload allocations, in compliance with the EPA regulation that requires a discharge permit for a point source to contain such effluent limitations. *See* 40 CFR §122.44(d)(1)(vii)(B). Given that the impervious surface restoration requirement is such an effluent limitation, *Anacostia Riverkeeper* seems to answer the question raised by Frederick County – *i.e.*, that the 20 percent impervious surface restoration requirement in the permit is valid and authorized by the Clean Water Act. However, in *Anacostia Riverkeeper*, the Court was addressing a question somewhat distinct from the one posed in this case. In that case, the question was whether the impervious surface restoration requirement *satisfied* the MEP standard whereas in this case the question is whether it *unlawfully exceeds* it. The resolution of this question requires statutory construction of the provision in which the MEP standard appears – 33 U.S.C. §1342(p)(3)(B)(iii) – which we shall refer to as clause (B)(iii) for ease of reference.

*Construing Clause (B)(iii) – Statutory Language*

The Clean Water Act specifically addresses municipal and industrial stormwater discharges in 33 U.S.C. §1342(p), which consists of six paragraphs. Paragraph 3 of that subsection sets forth "permit requirements."[42] That paragraph reads as follows:

---

[42] Paragraphs 1 and 2 concern the timing of the requirement to obtain certain stormwater discharge permits. Paragraph 4 concerns the application requirements for those permits. Paragraph 5 authorizes the EPA to conduct a study on other stormwater discharges not covered by those permits. Paragraph 6 authorizes the EPA to adopt regulations based on the study required by paragraph 5. 33 U.S.C. §1342(p)(1)-(2), (4)-(6).

39

(3) Permit requirements

(A) Industrial discharges

Permits for discharges associated with industrial activity shall meet all applicable provisions of [section 1342] and section 1311 of this title.

(B) Municipal discharge

Permits for discharges from municipal storm sewers—

(i)  may be issued on a system- or jurisdiction-wide basis;

(ii) shall include a requirement to effectively prohibit non-stormwater discharges into the storm sewers; and

(iii)  shall require controls to reduce the discharge of pollutants to the maximum extent practicable, including management practices, control techniques and system, design and engineering methods, and such other provisions as the [EPA] Administrator or the State determines appropriate for the control of such pollutants.

33 U.S.C. §1342(p)(3).  Subparagraph (A) relates to permit requirements for discharges by industrial sources such as factories, landfills, construction sites, and power plants that have operations exposed to rain water or snow melt.  Subparagraph A does not directly relate to the requirements in MS4 discharge permits.[43]

Our focus is on Subparagraph (B) concerning the requirements for MS4 permits. The first two clauses concern the geographic scope of an MS4 permit (clause (B)(i)) and

---

[43] *See* 40 CFR §122.26(b)(14) ("Storm water discharge associated with industrial activity means the discharge from any conveyance that is used for collecting and conveying storm water and that is directly related to manufacturing, processing or raw materials storage areas at an industrial plant.").

the separation of stormwater discharges from other discharges (clause (B)(ii)), but do not include a reference to the MEP standard.

Clause (B)(iii) concerns the controls and provisions required to reduce the discharge of pollutants from MS4s. As is evident, the MEP standard appears in this clause. The Department and the County disagree as to the role that the MEP standard plays in clause (B)(iii).

To construe clause (B)(iii) we begin, of course, with the plain language of the statute. As this case illustrates, however, statutory language is not always "plain" in the sense that it may take on different meanings, depending on how one parses a series of words or clauses. The Department and Frederick County tabulate clause (B)(iii) in slightly different ways to support their contrary interpretations. We apply an editorial pen below to illustrate these different interpretations.

Frederick County's favored construction of clause (B)(iii) can be illustrated as follows:

> Permits for discharges from municipal storm sewers –
>
> (iii) shall require controls to reduce the discharge of pollutants to the maximum extent practicable, including (1) management practices, (2) control techniques and systems, (3) design and engineering methods, and (4) such other provisions as the [EPA] Administrator or the State determines appropriate for the control of such pollutants.

Under the County's construction, the "controls" subject to the MEP standard are listed in a series following the word "including" – a series of four categories that includes (1) management practices, (2) control techniques and systems, (3) design and engineering methods, and (4) such other provisions as the permitting agency deems appropriate. In that

41

view, there are four categories of pollution controls that might be required by an MS4 permit, including a final catchall category, and all four fall under the MEP umbrella. As indicated above, to support its preferred tabulation and avoid a phrase in the middle of the series of clauses ("system methods") that the County claims is nonsensical, the County asserts that the word "system" is the result of a "typographical error" in the statute that needs to be corrected to "systems."[44]

In contrast, the Department's construction opts for a different tabulation, but does not require revision of the language of the statute. That interpretation can be illustrated as follows:

> Permits for discharges from municipal storm sewers –
>
> (iii) shall require (1) controls to reduce the discharge of pollutants to the maximum extent practicable, including (a) management practices, (b) control techniques and (c) system, design and engineering methods, and (2) such other provisions as the [EPA] Administrator or the State determines appropriate for the control of such pollutants.

Under this construction of the statute, the three categories of controls enumerated in the initial series – *i.e.*, certain "practices," "techniques," and "methods" – are subject to the MEP standard while "other provisions" that the permitting agency deems appropriate under the final clause are not limited by the MEP standard. The Department's construction does not require revision of the text itself, and groups items that could comfortably fit within the

---

[44] In support of its contention that the statute contains a typographical error, the County notes that the word "systems" appears in various documents related to stormwater discharge permits, including two statements made while the legislation was debated in Congress.

category of "controls" separately from the final clause's vaguer and seemingly broader reference to "appropriate … provisions."

Confronted with similar competing grammatical arguments concerning the application of the MEP standard in clause (B)(iii), a state appellate court in California concluded that "[a]lthough it is not the clearest way of articulating the concept, the language of [clause (B)(iii)] does communicate the basic principle that the EPA [or an authorized state] retains the discretion to impose 'appropriate' water pollution controls in addition to those that come within the definition of [MEP]." *Bldg. Indus. Assn. of San Diego Cty. v. State Water Res. Control Bd.*, 124 Cal. App. 4th 866, 882-83 (2004) ("*BIA* case").[45] That court upheld requirements in an MS4 permit based on water quality standards in the face of a contention, similar to that of Frederick County in this case, that those provisions unlawfully exceeded the MEP standard.

Thus, the statement in *Anacostia Riverkeeper* in a somewhat different context and the assessment of the *BIA* court in a similar context both favor the Department's construction of clause (B)(iii). We also consider what legislative history exists and the administrative construction of this federal statute by the federal agency charged with administering it – the EPA.

---

[45] *See also* John H. Minan, *Municipal Separate Storm Sewer System (MS4) Regulation Under the Federal Clean Water Act: The Role of Water Quality Standards?*, 42 San Diego L. Rev. 1215, 1241-42 (2005) (discussion of grammatical argument in *BIA* case by law professor who served on the permitting agency in that case).

*Legislative History of Clause (B)(iii)*

When Congress was considering the legislation that added the MS4 permit requirements to the Act, legislators often spoke in general terms about achieving water quality standards without elaborating on the MEP standard or addressing whether that standard should apply to every pollutant control in an MS4 permit. Some statements suggested that water quality based standards – *i.e.*, standards other than MEP – would be part of MS4 permits. For example, one senator stated that MS4 permit pollution control "requirements are to contain control technology or other techniques to control these discharges and should conform to water quality requirements." 133 Cong. Rec. S733-02, 1987 WL 928615 (January 14, 1987) (statement of Senator Chafee). On the other hand, another senator paraphrased clause (B)(iii) in language that mirrors the County's interpretation, including substituting the plural "systems" for "system." *Id*. (statement of Senator Durenberger). Yet another member of Congress both alluded to the goal of controlling stormwater discharges "to protect the quality of the Nation's waters" and in paraphrasing the legislation, used the word "systems." 133 Cong. Rec. H168-03, 1987 WL 928356 (January 8, 1987) (statement of Representative Roe). In the end, what legislative history exists is "not especially illuminating" on the role of the MEP standard.[46]

---

[46] Minan, *supra*, note 45, at 1243-44.

44

*EPA's Administrative Construction of Clause (B)(iii)*

The EPA's position for many years was that an MS4 permit, like any discharge permit, must achieve compliance with water quality standards.[47]  Indeed, when it adopted regulations for Phase I MS4 permits, the agency described the controls that would be required by such permits as follows:  "[MS4] permits are to establish controls to the maximum extent practicable[,] effectively prohibit non-storm water discharges to the [MS4] *and, where necessary, contain applicable water quality-based controls*."  EPA, *National Pollutant Discharge Elimination System Permit Application Regulations for Storm Water Discharges – Final Rule*, 55 Fed. Reg. 47990, 47995 (November 16, 1990) ("EPA Preamble to 1990 Phase I MS4 Rule") (emphasis added).

The EPA partially backed away from this view after the United States Court of Appeals for the Ninth Circuit held that MS4 permits need not include water quality based effluent limitations.  *See* EPA, *National Pollutant Discharge Elimination System – Regulations for the Water Pollution Control Program Addressing Storm Water Discharges - Final Rule*, 64 Fed. Reg. 68722, 68753 (December 8, 1999) ("EPA Preamble to 1999

---

[47] EPA, *Interim Permitting Approach for Water Quality-Based Effluent Limitations in Storm Water Permits*, 61 Fed. Reg. 43761 (August 26, 1996); EPA, *Questions and Answers Regarding Implementation of an Interim Permitting Approach for Water Quality-Based Effluent Limitations in Storm Water Permits*, 61 Fed. Reg. 57425 (November 6, 1996);  EPA, *Memorandum from E. Donald Elliott, Assistant Administrator and General Counsel, EPA, re: Compliance with Water Quality Standards in NPDES Permits Issued to Municipal Separate Storm Sewer Systems* (January 9, 1991) at 1; *see also* Oliver A. Houck, *TMDLs III: A New Framework for the Clean Water Act's Ambient Standards Program*, 28 Envtl. L. Rep. 10415, 10428 (1998) (discussing the EPA's interpretation); Minan, *supra*, note 45, at 1245-46 (same).

Phase II MS4 Rule") (recognizing that a Ninth Circuit decision "disagree[d] with EPA's interpretation of the relationship between" §1311 and §1342(p)). Specifically, in *Defenders of Wildlife v. Browner*, 191 F.3d 1159, 1164 (9th Cir. 1999), the Ninth Circuit held that §1342(p)(3) "unambiguously demonstrates that Congress did not require [MS4s] to comply strictly with" §1311(b)(1)(C), which requires that discharge permits contain water quality based effluent limitations as needed.[48] On the other hand, the court also stated that the final provision of clause (B)(iii) gives the EPA (and thus a state permitting agency) the discretion to "determine that ensuring strict compliance with state water-quality standards is necessary to control pollutants [or] to require less than strict compliance with state water quality standards." 191 F.3d at 1166.[49] Thus, while the Ninth Circuit did not

---

[48] As noted earlier, while clause (A) of §1342(p)(3) requires industrial stormwater dischargers to comply with all of §1311 (*i.e.*, with both technology based and water quality based effluent limitations), clause (B) lays out different requirements for MS4s without mentioning §1311. The Ninth Circuit reasoned that, for MS4 permits, clause (B)(iii) "replaces" *both* the technology and water quality based effluent limitation requirements in §1311. 191 F.3d at 1165.

[49] A related question – which is not raised here and which, therefore, we do not address – is whether MS4 permits may require strict compliance with water quality standards. That question is at issue in two cases in the United States Court of Appeals for the District of Columbia Circuit that are currently in settlement proceedings. *Center for Regulatory Reasonableness v. EPA*, Case Nos. 17-1060 & 16-1246 (D.C. Cir.). The challengers in those cases argue that certain Phase II MS4 general permits issued by the EPA violate clause (B)(iii) by requiring compliance with water quality standards. The situation here is different in that no party claims that the Counties' permits expressly require compliance with water quality standards.

46

agree with the EPA's existing construction, it nevertheless recognized that a permitting agency had discretion to include permit terms based on water quality standards.[50]

In any event, after the *Defenders of Wildlife* decision, the EPA modified its administrative interpretation of clause (B)(iii). Whereas the agency had taken the view that MS4 permits, like all discharge permits, must contain water quality based effluent limitations as needed, after the Ninth Circuit decision the EPA viewed such limitations as permissible, but not mandatory, in MS4 permits. It cited *Defenders of Wildlife* as support for the proposition that clause (B)(iii) "specifically preserves the authority for EPA or [authorized states] to include other provisions determined appropriate to reduce pollutants in order to protect water quality." EPA Preamble to 1999 Phase II MS4 Rule, 64 Fed. Reg. at 68788. Accordingly, the Phase II regulation provides that "[a]s appropriate, the permit [for a small MS4] will include [m]ore stringent terms and conditions, including permit requirements ... based on an approved [TMDL] or equivalent analysis, or where the [EPA or state] determines such terms and conditions are needed to protect water quality." 40 CFR §122.34(c)(1). Although the 1999 preamble and rule concern Phase II MS4 permits, the EPA's views on water quality based limitations generally apply to all MS4 permits.

---

[50] Other courts have pointed to *Defenders of Wildlife* as setting forth the discretion that the EPA (and state permitting agencies) have in drafting MS4 permit terms to require pollution controls that satisfy the MEP standard or a more demanding water quality based standard. *See Natural Resources Defense Council v. New York State Dep't Envtl Conservation*, 994 N.Y.S. 2d 125, 135 (N.Y. App. 2014), *aff'd*, 34 N.E.3d 782 (N.Y. 2015); *Conservation Law Foundation, Inc. v. Boston Water and Sewer Commission*, 2010 WL 5349854 at *5-6 (D. Mass. 2010); *Tualatin Riverkeepers v. Oregon Dep't Envtl Quality*, 230 P.3d 559, 563-64 & n.10 (Ore. App. 2010); *City of Arcadia v. State Water Resources Control Board*, 135 Cal.App. 4th 1392, 1429 (2006).

For example, the *Defenders of Wildlife* decision upheld Phase I MS4 permits issued by the EPA that included water quality based limitations.[51]

The EPA has maintained that position through at least the time period relevant for this litigation. In other words, since 1990, the EPA has held the view that the Act at least authorizes water quality based effluent limitations in MS4 permits.[52] For example, in a letter to the Department concerning Frederick County's permit that appears in the administrative record, the EPA made clear that permitting agencies may include water quality based effluent limitations in MS4 permits: "Where the [permitting] authority determines that MS4 discharges have the reasonable potential to cause or contribute to a water quality standard excursion as [the Department] has done in this case, EPA recommends that the … permitting authority exercise its discretion to include appropriate narrative and/or numeric water quality-based effluent limitations … as necessary to meet water quality standards." EPA Letter to Maryland Department of the Environment re

---

[51] *See In re: Arizona Municipal Storm Water NPDES Permits for City of Tucson, Pima County, City of Phoenix, City of Mesa, and City of Tempe*, 1998 WL 284966, at *2 n.1 (EAB May 21, 1998) (stating, in the administrative decision that was reviewed in *Defenders of Wildlife*, that the permittees were properly classified as operators of MS4s requiring Phase I permits).

[52] In its critique of the impervious surface restoration term of the Frederick County MS4 permit, the Dissenting Opinion of Judge Watts discounts the EPA's interpretation of the Clean Water Act which, as indicated in the text, follows the interpretation of the Act by the Ninth Circuit in *Defenders of Wildlife*. *See* Watts Dissenting slip op. at 11-12 & n.7. Given the ambiguity in clause (B)(iii), the EPA's interpretation – which is consistent with the construction of the statute by the federal courts – is entitled to deference under *Chevron* (and even if the *Chevron* did not apply, under *Skidmore*).

Supplemental Comments on Frederick County Phase I MS4 Permit (September 23, 2014).

The EPA also stated that the requirement of consistency between TMDLs and permits applies to MS4s as it does to all point sources: "Pursuant to 40 CFR 122.44(d)(1)(vii)(B), where there is an applicable [TMDL] approved or established by EPA, a [discharge] permit must include effluent limitations that are consistent with the wasteload allocation . . . in the TMDL. This includes MS4 permits." *Id*.

*Harmonizing MS4 Permit Terms with the TMDL Process*

Clause (B)(iii) is to be read harmoniously with the Act as a whole, including the TMDL process. *See King v. St. Vincent's Hospital*, 502 U.S. 215, 221 n.10 (1991) (when construing statute, court should read statute as a whole and harmonize its provisions); *Condon v. State of Maryland-Univ. of Maryland*, 332 Md. 481, 491 (1993) (same). In our view, the EPA's and Department's interpretation of clause (B)(iii) is more consistent with the Act as a whole than the alternative proposed by Frederick County.

The EPA's regulations require that a water quality based effluent limitation be derived from the applicable water quality standard, without referring to a practicability test. Permitting agencies "shall ensure that [t]he level of water quality to be achieved by [water quality based effluent limitations] on point sources ... is derived from, and complies with, all applicable water quality standards." 40 CFR §122.44(d)(1)(vii)(A). The EPA's rationale is that "[d]eriving water quality-based effluent limits from water quality standards is the only reliable method for developing water quality-based effluent limits that protect aquatic life and human health." EPA, *National Pollutant Discharge Elimination System; Surface Water Toxics Control Program – Final Rule*, 54 Fed. Reg. 23868, 23879 (June 2,

49

1989) (preamble to publication of the EPA's rule that, in part, adopted 40 CFR §122.44(d)(1)(vii)). Importantly, this rationale does not distinguish between types of point sources, *i.e.*, whether the discharger is a factory, a wastewater treatment plant, an MS4, or any other kind of point source. The process of implementing TMDLs via discharge permits "results in effluent limits that protect aquatic life and human health because the limits are derived from water quality standards." *Id.* In other words, when translating TMDL wasteload allocations to effluent limitations in a permit, the pertinent water quality standard remains the touchstone. Thus, when an entity discharges to a waterway subject to a TMDL, its permit must contain effluent limitations consistent with the "assumptions and requirements" of the corresponding wasteload allocation in the TMDL. 40 CFR §122.44(d)(1)(vii)(B).

When the final provision of clause (B)(iii) is read to encompass water quality based effluent limitations, MS4 permits are treated like any other discharge permit for purposes of implementing TMDLs. This interpretation harmonizes clause (B)(iii) with the TMDL provisions insofar as the latter likewise do not distinguish between types of point sources. By contrast, if permitting agencies must constrain all TMDL based effluent limitations in MS4 permits by some sort of practicability analysis, there would be tension with the basic tenet that water quality based effluent limitations must derive from water quality standards.

*Summary*

In including the impervious surface restoration requirement in Frederick County's permit, the Department acted consistently with the EPA's interpretation of clause (B)(iii) – that is, that the Act authorizes permitting agencies to include water quality based effluent

50

limitations in MS4 permits without reference to the MEP standard. As explained earlier, clause (B)(iii) is ambiguous. A federal court reviewing the EPA's interpretation of an ambiguous federal statutory provision under *Chevron* would defer to the agency's reasonable construction of that language. In our view, the EPA's interpretation of clause (B)(iii) is a reasonable construction that is consistent with the rest of the Act and accords with the Ninth Circuit decision in *Defenders of Wildlife* and other applicable court decisions. Even under the less deferential *Skidmore* standard of review, a federal court would likely defer to the agency's interpretation in light of its consistent view that MS4 permits are subject to standards emanating from TMDLs. Moreover, the Department was "bound to follow EPA's interpretation" in light of the Clean Water Act's scheme of cooperative federalism. *Natural Resources Defense Council v. New York State Dep't of Envtl Conservation*, *supra*. Accordingly, we hold that the Department did not act unlawfully in including a water quality based effluent limitation (the impervious surface restoration requirement) not subject to the MEP standard in the County's permit.[53]

3.    Whether the Inclusion of the Impervious Surface Restoration Requirement in Frederick County's Permit was Arbitrary and Capricious

Frederick County also argues that, regardless of whether the Act authorizes the Department to include an impervious surface restoration requirement in MS4 permits

---

[53] Because we hold that the Act authorizes the impervious surface restoration requirement in the County's permit, we need not address the Department's alternative argument that Maryland law allows such a condition as consistent with the federal Act's provision allowing for more stringent state-set permit conditions. *See* 33 U.S.C. §1370.

51

without reference to the MEP standard, the Department acted arbitrarily and capriciously when it included such a provision in the County's permit. The County notes that, during the comment period on the draft permit, it submitted to the Department a report that purportedly demonstrated that compliance with the permit's requirements within five years was financially and logistically impossible.[54]

As noted earlier, when agency action is challenged as arbitrary and capricious, the question is whether there was a rational basis for that action. *See* Part II.A. of this Opinion. In answering that question, a reviewing court is to be "extremely deferential" to the agency and not to substitute its own judgment for that of the agency. To assess whether the Department acted arbitrarily and capriciously in its consideration of Frederick County's objection to the permit term, we review both the procedure that the Department followed and the substance of its action.

*Procedure*

Consistent with EN §1-604(a), the Department first issued a "tentative determination" together with the draft permit on June 28, 2014. A public comment period followed, during which the Department received many comments on the draft permit. After consideration of those comments, the Department published a "final determination"

---

[54] As described above, the General Assembly authorized counties to charge a stormwater remediation fee to help finance stormwater management and restoration required by MS4 permits. *See* EN §4-202.1. Frederick County adopted a fee of 1¢; at oral argument before this Court, the County explained that it had elected to use general funds to finance its obligations under the Clean Water Act.

on December 10, 2014, along with the final permit, consistent with EN §1-604(b). *See Basis for Final Determination to Issue Frederick County's NPDES MS4 Permit MD0068357 (December 2014) ("Basis for Final Determination – Frederick County").*

In general, the Environment Article gives the Department broad discretion in replying to comments when the agency takes final action on a proposed permit. The Department is not obliged to respond to all public comments, but rather may "pick and choose" the comments it addresses. *Kor-Ko Ltd. v. Maryland Dep't of the Env't*, 451 Md. 401, 422 n.18 (2017). The fact that an agency does not change a proposed action or regulation in light of comments requesting a change does not mean that the process lacked a meaningful opportunity for comment or that the agency failed to consider those comments. *See Fogle v. H & G Rest., Inc.*, 337 Md. 441, 463 (1995).

*Substance*

In its comments on the draft permit, Frederick County voiced its concerns about the feasibility of compliance with the impervious surface restoration requirement. The Department addressed Frederick County's concerns about cost and feasibility, as well as a number of other issues in the Basis for Final Determination that the Department published with the final version of the permit.[55] Basis for Final Determination – Frederick County at 18. The Department noted that the County believed that the 20 percent restoration

---

[55] In the same document, the Department also addressed similar cost and feasibility "estimates" submitted by Charles County and Harford County. Basis for Final Determination – Frederick County at 18.

requirement "exceeds an MEP level of effort and that compliance would be financially and operationally infeasible." *Id.* at 22. The Department responded to those concerns by explaining that the restoration requirement was necessary for consistency with the Bay TMDL and the Maryland WIP. *Id.* The Department also stated that the EPA had reviewed the permit for such consistency and was "satisfied" that the permit achieved it based, in part, on the impervious surface restoration requirement. *Id.* Although the Department's response may not have amounted to a point-by-point refutation of every detail of the County's comments, it did address the significant issues raised by the County. We cannot say that the Department failed to respond in a reasoned manner.

In particular, the Department had a rational basis for saying that the restoration requirement is necessary for consistency with the Bay TMDL and the Maryland WIP. As this Court recognized in *Anacostia Riverkeeper*, the EPA relied on the Maryland WIP, which included the impervious surface restoration requirement, when developing the Bay TMDL and the restoration requirement was a "key element" in securing EPA's endorsement of the Maryland WIP. 447 Md. at 128.

It was reasonable for the Department to respond to the County's claim of impossibility by explaining that the restoration requirement derives from the Bay TMDL and the Maryland WIP. The Bay TMDL and Maryland WIP were the result of significant deliberation among various stakeholders together with the EPA and the Department. For example, the record shows that Frederick County and the Department had been discussing practicability and feasibility since at least 2012.

In our view, the Department was not arbitrary or capricious in including the impervious surface restoration requirement in Frederick County's MS4 permit.

*C.* ***Whether the Permits Exceed the Appropriate Geographic Scope of an MS4 Permit***

Both Counties assert that their permits exceed the appropriate scope of an MS4 permit. The Counties focus on Part IV.E. of their permits. That section of the permit requires the County to (1) conduct a detailed watershed assessment for the entire County; (2) complete restoration of 20 percent of the impervious surface area in the County; (3) develop and implement restoration plans for meeting applicable stormwater wasteload allocations in EPA-approved TMDLs; (4) conduct public outreach and encourage public participation in the watershed assessments, restoration plans, and achievement of the TMDL limits and water quality standards; and (5) evaluate and document its progress in meeting stormwater wasteload allocations in EPA-approved TMDLs.

The Counties argue that the Department exceeded its authority under the Clean Water Act in its specification of the impervious surface restoration condition and in requiring compliance with stormwater wasteload allocations in applicable EPA-approved TMDLs. To some extent, these arguments are based on making a distinction between the permittee – in these cases, Frederick and Carroll Counties – and the activity that is authorized by the permits – the discharge of pollutants by the MS4s operated in each County.

1. Jurisdiction-Wide versus System-Wide Permits

The Clean Water Act provides that "[p]ermits for discharges from municipal storm sewers may be issued on a system- or jurisdiction-wide basis." 33 U.S.C.

§1342(p)(3)(B)(i). The EPA's regulations reiterate that a permitting authority such as the EPA or the Department may issue permits for Phase I MS4s on a system-wide or jurisdiction-wide basis. *See* 40 CFR §122.26(a)(1)(v) (in exercising residual designation authority to require Phase I permit, state or EPA may make designation on system-wide or jurisdiction-wide basis), 40 CFR §122.26(a)(3)(ii) (permit for a large or medium MS4 may be issued on system-wide basis or on a number of other bases, including with reference to the "jurisdiction"). Neither the statute nor the regulations elaborate on what it means for an MS4 permit to be issued on a "jurisdiction-wide" basis – as opposed to a "system-wide" basis.[56] The explanation offered by the EPA at the time it adopted these regulations indicates that it was concerned with ensuring that permitting authorities had the necessary flexibility to adapt permits to local conditions such as existing administrative systems, police powers, and land use authority. EPA Preamble to 1990 Phase I MS4 Rule, 55 Fed. Reg. at 48043.

---

[56] The EPA regulations suggest that – at least with respect to a Phase I MS4 that is classified as "large" or "medium" – a "jurisdiction-wide" permit may cover only a portion of the corresponding system. *See* 40 CFR §122.26(a)(3)(ii) (authorizing the issuance of either a system-wide permit "covering all discharges from [the MS4]" or "distinct permits for appropriate categories of discharges *within* [the MS4] including, but not limited to … discharges located within the same jurisdiction…") (emphasis added). This provision does not concern residually designated Phase I MS4s.

The permits that are the subject of this appeal are each issued to a County – a jurisdiction – in its capacity as the operator of an MS4 – a system.[57]  But the challenges raised by the Counties cannot be resolved by the descriptive label attached to their MS4 permits.  The Counties contend that, regardless of whether a permit is issued on a system-wide or jurisdiction-wide basis, the scope of the regulatory conditions in the permit must relate to the discharges authorized by the permit.  They argue that the baseline calculation for the impervious surface restoration requirement effectively makes the Counties responsible for pollutants carried by stormwater that does not flow into their MS4s.  The Counties further argue that permit provisions related to stormwater wasteload allocations in local TMDLs also do so.

2.      The Impervious Surface Restoration Requirement

Impervious surface restoration requirements have been part of MS4 permits issued by the Department since at least 1999.  Maryland WIP at 2-26.  The previous generation of each County's permit included an impervious surface restoration requirement of 10 percent of each County's unrestored impervious surface.[58]

---

[57] The Carroll County permit also includes, as co-permittees, all of the incorporated municipalities in the County and thus pertains to several jurisdictions and several systems. *See* 40 CFR §122.26(a)(3), (b)(1).

[58] The general permit applicable to Phase II small MS4s also includes an impervious surface restoration term, although it differs from the one included in the permits of Phase I MS4s like the Counties.  The current Phase II general permit requires restoration of 20 percent of the unrestored impervious surface in each permittee's urbanized area by 2025.

*The Impervious Surface Restoration Condition in the Current Permit*

With respect to impervious surface restoration, the current permit provides:

> Within one year of permit issuance, [the] County shall submit an impervious surface area assessment consistent with the methods described in the [Department] document "Accounting for Stormwater Wasteload Allocations and Impervious Acres Treated, Guidance for National Pollutant Discharge Elimination System Stormwater Permits" (MDE, June 2011 or subsequent versions). Upon approval by [the Department], this impervious surface area assessment shall serve as the baseline for the restoration efforts required in this permit.

> By the end of this permit term, [the] County shall commence and complete the implementation of restoration efforts for twenty percent of the County's impervious surface area consistent with the methodology described in the [Department] document cited in [this section] that has not already been restored to the MEP. Equivalent acres restored of impervious surfaces, through new retrofits or the retrofit of pre-2002 structural [best management practices], shall be based upon the treatment of the $WQ_v$ criteria and associated list of practices defined in the *2000 Maryland Stormwater Design Manual.* For alternate [best management practices], the basis for calculation of equivalent impervious acres restored is based upon the pollutant loads from forested cover.

Carroll County Phase I MS4 Permit MD0068331, Part IV.E.2.a; Frederick County Phase I MS4 Permit MD0068357, Part IV.E.2.a.

On its face, this provision does not require the County to undertake impervious surface restoration outside the geographic area that drains to the MS4, as it does not dictate where such restoration must take place.[59] But the permit provision uses unrestored

---

[59] Some permit terms specify actions within the MS4 service area. For example, Part IV.D. of the permit requires the County to implement certain management programs in "areas served by [the] County's MS4." Some required programs involve actions that are necessarily conducted on a county-wide basis, including outside the service area of the MS4 – *e.g.*, an "acceptable stormwater management program" under EN §4-201 *et seq.*, an

impervious surface throughout the *entire County* – not just within the MS4 service area – as a starting point, or baseline, for calculating the required restoration.[60] (In the case of both Counties, the County's MS4 serves only a portion of the County's geographic area).

The Counties do not contend that the inclusion of an impervious surface restoration requirement itself is beyond the scope of an MS4 permit. Rather, they argue that the reference to a county-wide measure of impervious surface as the baseline for the requirement in the permit exceeds the Department's authority. They assert that the reference to that baseline in a permit has the effect of making the County responsible for pollutants that never enter the County's MS4.

*Anacostia Riverkeeper*

This Court considered the validity of an impervious surface restoration requirement in *Anacostia Riverkeeper.* In that case, the Phase I MS4 permits in question included an identical term requiring the permittee counties to restore 20 percent of the unrestored

---

"acceptable erosion and sediment control program" under EN §4-101 *et seq.* and a "public education and outreach program to reduce stormwater pollutants." MS4 Permits, Part IV.D. 1, 2, 6. If the permits are modified (as sought by the Counties) to allow water quality trading as a compliance method, the pollution reductions for which a County would receive credit would not necessarily occur within the County, much less within its MS4 service area. *See* Part II.E. of this Opinion.

[60] In particular, the permit term refers to restoration of 20 percent of the County's impervious surface area consistent with the methodology in the Department's guidance document. That methodology involves a calculation of the impervious surface area throughout the entire County (after excluding certain areas that are not directly at issue here). *See* Accounting for Stormwater Wasteload Allocations and Impervious Acres Treated (August 2014) at 1, 6-10.

impervious surface over the five-year period covered by their permits. The requirement was challenged by environmental advocacy groups as "too opaque" to satisfy the Act's direction that MS4 permits include provisions to reduce pollutants that satisfy the MEP standard.[61] They also argued that the Department had failed to adequately explain its use of the 20 percent restoration condition or how that level of restoration would achieve the Bay TMDL.

This Court concluded that impervious surface restoration, as carried out in accordance with the Department's Stormwater Design Manual (incorporated by reference in the permit term), is a stormwater management practice that functions as a "surrogate" for direct reduction of pollutants in stormwater and that satisfies the MEP standard. 447 Md. at 122-23. Noting that the 20 percent restoration requirement was consistent with the Maryland WIP, the Court further held that the Department's decision to include that requirement in the permits under review was supported by substantial evidence and was not arbitrary and capricious. *Id.* at 128-29. The Court also upheld the temporal baseline selected by the Department for measuring compliance with the 20 percent requirement. In particular, it held that the Department had not erred in using the measure of unrestored impervious surface in the counties in 2002 as the baseline. *Id.* at 132.

In this case, the Counties also challenge the baseline used for the impervious surface restoration requirement. However, in contrast to *Anacostia Riverkeeper*, the basis of that

---

[61] The MEP standard is discussed in Part II.B. of this Opinion.

challenge is geographic rather than temporal.[62]  It is rooted in the notion that MS4 permits

under the Act regulate discharges of pollutants only from an MS4 itself.  *See* 33 U.S.C.

§1342(p)(3) (setting forth permit requirements for "permits for discharges from [MS4s]").

In the Counties' view, use of a county-wide baseline violates that principle because some

of the impervious surface included in that baseline is associated with pollution that never

enters the MS4.[63]  According to the Counties, to be consistent with the Clean Water Act,

an impervious surface restoration requirement must reference a baseline that includes only

the MS4 service area.[64]

---

[62] The Counties point out that the use of 2002 as the baseline year for assessment of the County's impervious surface – instead of 1985, the baseline year in the Maryland WIP – would effectively increase the target amount of restoration.  Use of 2002 as the baseline year would increase the baseline amount of impervious surface by including development between 1985 and 2002. (In *Anacostia Riverkeeper*, environmental groups had argued that a baseline year later than 2002 should have been used – *i.e*., that use of the 2002 baseline was too lenient).  However, in arguing that they are being held responsible for pollutant discharges that do not emanate from their MS4s, the Counties focus on the geographical element of the baseline calculation.

[63] This is based on the following reasoning.  Obviously, rain can fall anywhere in a jurisdiction, such as a county, that operates an MS4.  The rain will carry some pollutants into conveyances within the county's MS4 and, from there, into waterways.  Other pollutants, however, may never encounter the MS4.  Instead, they will run into waterways directly from fields, farms, parking lots, or other land uses in the county that are out of reach of the MS4.  Under the Act, the pollutants carried through the MS4 constitute a form of point source pollution, and the pollutants *not* carried through the system are a form of nonpoint source pollution (often called "stormwater runoff").  Since MS4 permits under the Act authorize only discharges from point sources, such a permit may only include conditions related to stormwater and the accompanying pollutants that enter (and are discharged from) the MS4, not stormwater that never encounters the MS4.  *See Envtl Def. Ctr., Inc. v. EPA*, 344 F.3d 832, 841 n.8 (9th Cir. 2003).

[64] Carroll County also invokes the doctrine of offensive non-mutual collateral estoppel to argue that the Department is barred from using a county-wide baseline for

*Origin of the 20 Percent Restoration Requirement*

There is no question that the pollutant discharges that the permit authorizes are those from each County's MS4.  As this Court noted in *Anacostia Riverkeeper* and as discussed in the previous section of this Opinion, the impervious surface restoration term is a water quality based effluent limitation authorized by 33 U.S.C. §1342(p)(3)(B)(iii).  In particular, such a permit term is a numeric water quality based effluent limitation, as recognized by the EPA.[65]

---

impervious surface.  In particular, the County cites a 2003 administrative decision by the Department's final decisionmaker, which struck certain provisions of wastewater discharge permits issued to three poultry processors.  *Tyson Foods, Inc., et al. v. MDE*, OAH Case No. MDE-WMA-063-200200001 (June 12, 2003).  The final decisionmaker concluded that, under State law, the permits could not include conditions that required the processors to undertake certain activities relating to chicken manure at the farms of those who raised chickens that were sold or otherwise provided to the processors, particularly when the growers were not co-permittees.

The *Tyson Foods* administrative decision did not involve an MS4 permit, much less an issue identical to the one in this case, and did not discuss the Clean Water Act, EPA regulations, or any other federal law, for that matter.  Under those circumstances, the doctrine of offensive non-mutual collateral estoppel does not apply to determine the outcome of this case.  *See Garrity v. Maryland State Board of Plumbing*, 447 Md. 359, 369 (2016) (among other things, issue decided in prior adjudication must be identical for collateral estoppel to apply).  The reasoning of the administrative decision in *Tyson Foods* may be analogous in some respects to the argument advanced by the Counties in this case, but it is not dispositive.

[65] *See* EPA, *Post-Construction Performance Standards & Water Quality-Based Requirements: A Compendium of Permitting Approaches* (June 2014) at 19 (including impervious surface restoration terms in Maryland MS4 permits in a list of examples of numeric water quality based effluent limitations); EPA, *Revisions to the November 22, 2002 Memorandum "Establishing Total Maximum Daily Load (TMDL) Wasteload Allocations (WLAs) for Storm Water Sources and NPDES Permit Requirements Based on WLAs"* (November 26, 2014) at 10 (identifying an identical 20% restoration term in the Prince George's County MS4 permit as a numeric water quality based effluent limitation).

Importantly, the amount of impervious surface to be restored is simply a surrogate or proxy for an amount of pollution to be reduced. The Department's guidance document incorporated in the permit term explains how to calculate loads of pollution reduced, given a certain kind and quantity of impervious surface restoration activity. Thus, when the Department is determining how a county should calculate the number of impervious surface acres to be restored, the Department is effectively determining a measure of pollution reduction.

As explained earlier, the EPA's regulations require that a water quality based effluent limitation be derived from applicable water quality standards, without reference to a practicability test. *See* 40 CFR §122.44(d)(1)(vii)(A). This is because "[d]eriving water quality-based effluent limits from water quality standards is the only reliable method for developing water quality-based effluent limits that protect aquatic life and human health." EPA, *National Pollution Discharge Elimination System: Surface Water Toxics Control Program – Final Rule*, 54 Fed. Reg. 23868, 23879 (June 2, 1989); *see also Natural Resources Defense Council v. Fox*, 909 F. Supp. 153, 156 (S.D.N.Y. 1995).

With respect to the baseline for the impervious surface restoration requirement, those regulations require a permitting agency to craft the numeric component of a water quality based effluent limitation by reference to "all applicable water quality standards." 40 CFR §122.44(d)(1)(vii)(A). Thus, when establishing how each County is to calculate the number of impervious surface acres to be restored – *i.e.*, the proxy for an amount of pollution to be reduced – the Act and EPA regulations direct the Department to focus on what is necessary to achieve water quality standards in the Bay and the waters that feed it.

63

In our view, the Department's use of a county-wide baseline as a reference point for calculating the impervious surface restoration condition does not exceed the Department's authority under the Act because the impervious surface restoration condition implements a stormwater wasteload allocation in a TMDL (specifically, the Bay TMDL) designed to achieve water quality standards. Since at least 1991 the EPA has determined in various contexts, including regulation, that permitting authorities may make trade-offs between pollutant allocations for point and nonpoint sources. The EPA's definition of TMDL contemplates such trade-offs. *See* 40 CFR §130.2(i) ("If … nonpoint source pollution controls make more stringent load allocations practicable, then wasteload allocations can be made less stringent. Thus, the TMDL process provides for nonpoint source control tradeoffs.").

Given that the possibility of such trade-offs is inherent in the definition of TMDL, it is perhaps not surprising that the EPA has reiterated that concept when discussing how states are to develop TMDLs. *See* EPA, *Surface Water Toxics Control Program and Water Quality Planning and Management Program*, 57 Fed. Reg. 33040, 33048 (July 24, 1992) ("States have the flexibility to consider the relative costs of point and nonpoint source controls when preparing TMDLs, along with such other factors as reliability, relative effectiveness, and degree of assurance that nonpoint source controls will actually be implemented and maintained."); EPA, *Guidance for Water Quality-based Decisions: The TMDL Process* (1991) at 15 ("Under the [Act], the only federally enforceable controls are those for point sources through the NPDES permitting process. In order to allocate loads among both nonpoint and point sources, there must be reasonable assurances that nonpoint

source reduction will in fact be achieved. Where there are not reasonable assurances, under the [Act], the entire load reduction must be assigned to point sources.").

This long-established EPA policy is a reasonable interpretation of the Act and is entitled to deference under *Chevron*. Even if the EPA policy were not entitled to *Chevron* deference under federal law, we would defer to the agency under *Skidmore* and our own standards of review. As explained at the outset of this opinion, the Act requires the establishment of TMDLs when an existing regime of point source pollution controls is inadequate to achieve water quality standards. TMDLs reflect pollutant levels necessary to achieve those standards in compliance with the Act. The EPA has reasonably concluded that permitting authorities must have the discretion to allocate pollutant loads between point and nonpoint sources as needed to achieve the TMDL limits, including potentially ratcheting up the requirements on point sources when necessary. *See Farm Bureau*, 984 F. Supp.2d at 326 (in a case concerning the Bay TMDL, describing how a permit writer may apportion pollutant amounts – "loads" – among point and nonpoint sources in accordance with EPA guidance).[66]

---

[66] In practice, the broad discretion to allocate TMDL-established pollutant amounts between point and nonpoint sources means that permitting agencies may impose a level of pollution reduction on point sources in part to help offset nonpoint source pollution. *See* Michael M. Wenig, *How "Total" Are "Total Maximum Daily Loads"? – Legal Issues Regarding the Scope of Watershed-Based Pollution Control Under the Clean Water Act*, 12 Tul. Envtl. L.J. 87, 117 & n.131 (1998) (recognizing that TMDL allocations can require point sources to "bear the brunt of pollution reductions necessary to achieve" TMDLs); Oliver A. Houck, *TMDLs III: A New Framework for the Clean Water Act's Ambient Standards Program*, 28 ELR 10415, 10420 (August 1998) (recognizing permitting agencies' option of "ratcheting down further on point sources" when setting wasteload allocations).

Thus, nonpoint source pollution reduction may be assigned to point sources – *i.e.*, through wasteload allocations in the development of TMDLs. At bottom, it is this assignment of pollutant reductions to their wasteload allocations that is the essence of the Counties' objection to the impervious surface restoration requirement in their permits.[67] The Department's use of a county-wide baseline for the impervious surface restoration condition is thus related to the broad discretion of the states and the EPA, in drafting a TMDL, to assign an amount of nonpoint source pollution reduction to point sources.

Moreover, federal regulations require that point source permits contain effluent limitations consistent with the "assumptions and requirements" in wasteload allocations in applicable TMDLs. *See* 40 CFR §122.44(d)(1)(vii)(B). As this Court noted in *Anacostia Riverkeeper*, this standard is flexible. 447 Md. at 135. In this case, the impervious surface restoration term in the Counties' permits is consistent with the underlying premise of the Bay TMDL (by way of the Maryland WIP) that Maryland's Phase I MS4 permits will include a corresponding impervious surface restoration requirement.

That provision underwent significant development before reaching its final form in the permits. For example, in accordance with the EPA regulations governing discharge permits and a related memorandum of understanding with the Department, the EPA

_____

[67] The Maryland WIP states that the impervious surface restoration "strategy" (*i.e.*, 30% cumulative restoration for Phase I MS4s) is associated with a particular "load reduction," *i.e.*, a certain quantity of pollution reduction. Maryland WIP at 5-30.

formally objected to the Counties' draft permits because, among other things, the impervious surface restoration requirement was "not adequately expressed" and did not achieve compliance with the Bay TMDL. *See* EPA, Specific Objection to Carroll County Phase I MS4 Permit MD0068331 (September 20, 2012); EPA, Specific Objection to Frederick County Phase I MS4 Permit MD0068357 (September 20, 2012). In response to such objections and to comply with the requirement of consistency between TMDLs and discharge permits, the Department adjusted the impervious surface term in the Counties' permits to a form acceptable to the EPA. The EPA found the consistency requirement to be satisfied in the final version of the permits and withdrew its objection. EPA, Supplemental Comments on Carroll County Phase I MS4 Permit (September 23, 2014); EPA, Supplemental Comments on Frederick County Phase I MS4 Permit (September 23, 2014).

*Summary*

The impervious surface restoration term in the Counties' MS4 permits is a numeric water quality based effluent limitation corresponding to Maryland's stormwater wasteload allocation within the Bay TMDL. As such, when crafting that limitation, the Department was authorized to focus on what would be necessary to achieve water quality standards, and the Department determined that the baseline calculation method it chose was necessary to achieve applicable water quality standards for the Bay. The Department did not exceed

its authority under the Clean Water Act when it directed calculation of the impervious surface using a county-wide baseline.[68]

3.      Restoration Requirement Related to Local TMDLs

Both Counties point to certain permit conditions that require the Counties to adopt restoration plans and provide reports concerning compliance with stormwater wasteload allocations set forth in EPA-approved TMDLs for waterways in the Counties.  They argue that these provisions unlawfully make the Counties responsible for discharges of third parties.  These provisions appear in Part IV.E. of each County's permit and read as follows:

2.   Restoration Plans

*      *      *

b.    Within one year of permit issuance, [the] County shall submit to [the Department] for approval a restoration plan for each stormwater [wasteload allocation] approved by EPA prior to the effective date of the permit.  The County shall submit restoration plans for subsequent TMDL [wasteload allocations] within one year of EPA approval.  Upon approval by [the Department], these restoration plans shall be enforceable under this permit.  As part of the restoration plans, [the] County shall:

i.    Include the final date for meeting applicable [wasteload allocations] and a detailed schedule for implementing all structural and nonstructural water quality improvement projects, enhanced stormwater management programs, and alternative stormwater control initiatives necessary for meeting applicable [wasteload allocations];

ii.   Provide detailed cost estimates for individual projects, programs, controls, and plan implementation;

---

[68] Given this conclusion, we need not address whether the impervious surface restoration requirement is permissible as a State-determined effluent limitation that is "more stringent" than what the Act requires.

68

iii. Evaluate and track the implementation of restoration plans through monitoring or modeling to document the progress toward meeting established benchmarks, deadlines, and stormwater [wasteload allocations]; and

iv. Develop an ongoing, iterative process that continuously implements structural and nonstructural restoration projects, program enhancements, new and additional programs, and alternative [best management practices] where EPA approved TMDL stormwater [wasteload allocations] are not being met according to the benchmarks and deadlines established as part of the County's watershed assessments.

\*     \*     \*

4. TMDL Compliance

[The] County shall evaluate and document its progress toward meeting all applicable stormwater [wasteload allocations] included in EPA approved TMDLs. An annual TMDL assessment report with tables shall be submitted to [the Department]. This assessment shall include complete descriptions of the analytical methodology used to evaluate the effectiveness of the County's restoration plans and how these plans are working toward achieving compliance with EPA approved TMDLs. [The] County shall further provide:

a. Estimated net change in pollutant load reductions from all completed structural and nonstructural water quality improvement projects, enhanced stormwater management programs, and alternative stormwater control initiatives;

b. A comparison of the net change in pollutant load reductions detailed above with the established benchmarks, deadlines, and applicable stormwater [wasteload allocations];

c. Itemized costs for completed projects, programs, and initiatives to meet established pollutant reduction benchmarks and deadlines;

d. Cost estimates for completing all projects, programs, and alternatives necessary for meeting applicable stormwater [wasteload allocations]; and

e.      A description of a plan for implementing additional watershed restoration actions that can be enforced when benchmarks, deadlines, and applicable stormwater [wasteload allocations] are not being met or when projected funding is inadequate.

Carroll County Phase I MS4 Permit MD0068331, Part IV.E.2.b, IV.E.4; Frederick County Phase I MS4 Permit MD0068357, Part IV.E.2.b, IV.E.4.

The Counties assert that these permit terms are overbroad because some EPA-approved local TMDLs assign *nonpoint* source pollution to the Counties' MS4s, which are point sources. Carroll County specifically cites the fecal bacteria TMDL for Double Pipe Creek – one of the EPA-approved local TMDLs incorporated by reference in Attachment B to the Carroll County permit.[69]

The Double Pipe Creek TMDL assigns certain nonpoint source pollution – namely, "contributions [of fecal bacteria] from domestic animal and [septic system] sources" – to a stormwater wasteload allocation, which includes pollution budgeted to Carroll County's MS4.[70] Because the permit requires the County to develop "restoration plans" to achieve the stormwater wasteload allocations of relevant local TMDLs, the County argues that the permit makes the County responsible for addressing nonpoint pollution from third parties that never enters the County's MS4. The County uses the Double Pipe Creek TMDL as an

---

[69] The Double Pipe Creek watershed includes parts of both Counties and is also incorporated in Frederick County's permit.

[70] The Double Pipe Creek TMDL distributes this nonpoint source pollution between Carroll County's and Frederick County's MS4s.

example, but this argument would apply to any EPA-approved local TMDL that assigns nonpoint source pollution to stormwater wasteload allocations.[71]

This dispute concerns not so much the incorporation of EPA-approved local TMDLs in the permit, as the decisions that were made in the development of those TMDLs. In the case of the Double Pipe Creek TMDL, Carroll County is questioning a decision made when the EPA approved the Double Pipe Creek TMDL – namely, the decision to allocate pollution from nonpoint sources to the Counties' MS4s by way of a stormwater wasteload allocation in the TMDL.

Frederick County argues that, like the impervious surface restoration term, the restoration planning requirement "unlawfully regulates stormwater beyond the scope" of the Department's authority. The County bases this argument on the assertion that the local TMDLs "cover[] areas that do not drain to the County's MS4." The County provides little explanation for this argument, but as far as we can tell, it derives from the same concern raised by Carroll County – *i.e.*, the decision made by the Department at the local TMDL development stage to include nonpoint source pollution within the stormwater wasteload allocation.

---

[71] This issue is somewhat distinct from the issue discussed in the previous section of this Opinion concerning impervious surface restoration in that the allocations at issue there derived from the EPA's reliance on the Maryland WIP in devising the Bay TMDL, rather than directly from the EPA-approved TMDL itself.

71

For the reasons outlined earlier in this Opinion,[72] the Counties should have raised these arguments in a challenge to the EPA's approval of the Double Pipe Creek TMDL and other, similar local TMDLs. *See, e.g., City of Kennett v. EPA*, 887 F.3d 424 (8th Cir. 2018) (municipal challenge to EPA-approved TMDL that would affect municipality's wastewater permit). Therefore, we will not entertain these arguments here. *See Anacostia Riverkeeper*, 447 Md. at 129 n.46.

## D. *Whether the Counties are Appropriately Classified as Phase I Jurisdictions*

Frederick County first received an MS4 permit as a Phase I jurisdiction in 1994. It subsequently applied for and received a Phase I permit in 2002. In 2006, it applied for the Phase I permit at issue in this appeal. It first contested its status as a Phase I jurisdiction during the public comment period following the Department's publication of its draft permit in 2014 and reiterated those arguments when it sought judicial review of the final 2014 permit.

Carroll County first received an MS4 permit as a Phase I jurisdiction in 1995. It subsequently applied for and received Phase I permits in 2000 and 2005. Unlike Frederick County, it did not question its status as a Phase I jurisdiction during the administrative process for its most recent permit, which was issued in 2014, but first contested its status as a Phase I jurisdiction when it sought judicial review of that permit.[73]

---

[72] *See* Part II.A.2 of this Opinion.

[73] The Department argues that Carroll County may not now challenge its Phase I classification because, unlike Frederick County, it failed to raise the issue during the public comment period on its draft 2014 permit. However, given that Frederick County did

Both Counties argue that the Department has unlawfully treated them as Phase I jurisdictions because it has incorrectly classified them as "medium" (and therefore Phase I) – as opposed to "small" (and therefore Phase II) – MS4 jurisdictions since the time when they first applied for and received their first MS4 permits in the early 1990s. This distinction matters because, as indicated earlier, Phase I jurisdictions have generally been subject to earlier and more stringent permit requirements than Phase II jurisdictions. In particular, the Counties point to the impervious surface restoration requirement in their Phase I permits.[74] As relief, both Counties seek to be re-classified as Phase II jurisdictions with their permit terms conformed to those that apply to Phase II MS4s.

1.      Application of the MS4 Permit Requirement in Phases

*Phase I MS4 Permits*

In 1987, when Congress added the permit requirement for MS4s to the Clean Water Act, it did not require permits for all MS4 discharges immediately. Instead, it adopted a staggered approach.[75] This approach started with applying the permit requirement first to

_____

challenge the classification during the administrative process for its permit and that the issue is essentially the same for both Counties, we will not avoid the issue on the basis of lack of preservation.

[74] The impervious surface restoration requirement is more stringent in Phase I MS4 permits than a similar term in Phase II MS4 permits, in three ways: larger baseline (county wide vs. urbanized areas), earlier deadline (2019 vs. 2025), and higher percentage of area to be restored (30% vs. 20%).

[75] Congress created this staggered approach in the Water Quality Act of 1987 by explicitly recognizing that all MS4 discharges were subject to the Act's permit requirement, establishing a moratorium on that requirement until 1994, and then exempting

73

discharges from systems with the greatest potential to pollute waterways, which was referred to as Phase I. These MS4s included those serving larger populations, because areas with larger and denser populations tend to have more developed land with impervious surface and, as a result, generate more stormwater pollution.[76] Also included in the first round were MS4s determined by the EPA or a state to be significant contributors of pollutants, regardless of the size of the population served by those MS4s. This statutory authority to issue permits based on water quality impact (as opposed to the proxy of population served) is often referred to as the "residual designation authority" of the EPA and the states.

For our purposes, the relevant Phase I categories[77] are the following:

(1) *Large MS4.* A discharge from an MS4 serving a population of 250,000 or more, referred to in the statute as a "large MS4." 33 U.S.C. §1342(p)(2)(C), (p)(4)(A).

(2) *Medium MS4.* A discharge from an MS4 serving a population of 100,000 or more but less than 250,000, referred to in the EPA's

---

certain discharges from that moratorium at various intervals. *See* 33 U.S.C. §1342(p)(1)-(2). As a result, the permit requirement was imposed on MS4s in stages.

[76] Population served as a proxy for the amount of pollution in stormwater because "discharges from [MS4s] serving larger populations are thought to present a higher potential for contributing to adverse water quality impacts.... [P]ollutant loads from urban runoff strongly depend on the total area and imperviousness of developed land, which in turn is related to population." EPA Preamble to 1990 Phase I MS4 Rule, 55 Fed. Reg. at 48038.

[77] In all, Phase I covered five categories of MS4 stormwater discharges. *See* 33 U.S.C. §1342(p)(1)-(2). The other two Phase I categories are discharges for which a permit had been issued before 1987 and discharges associated with industrial activity – neither of which is at issue in this appeal. 33 U.S.C. §1342(p)(2)(A)-(B).

regulations as a "medium MS4." 33 U.S.C. §1342(p)(2)(D); 40 CFR §122.26(a)(1)(iv).

(3) *Residually Designated MS4*. A discharge for which the EPA or a state "determines that the stormwater discharge contributes to a violation of a water quality standard or is a significant contributor of pollutants to waters of the United States." 33 U.S.C. §1342(p)(2)(E).

The EPA adopted regulations in 1990 setting forth the permit requirements for Phase I jurisdictions. EPA, *National Pollutant Discharge Elimination System Permit Application Regulations for Storm Water Discharges – Final Rule*, 55 Fed. Reg. 47990 (November 16, 1990), *codified in* 40 CFR §122. Other than establishing different deadlines for the submission of permit applications by large and medium jurisdictions, the regulations generally did not distinguish among these three categories of Phase I MS4s. *See* 40 CFR §122.26(d).

Thus, in the early 1990s, an MS4 operated by a local government, like those of the Counties, would be required to obtain a Phase I permit if: (1) the MS4 served 100,000 or more people based on census figures, or (2) the EPA or the state had classified the MS4 as a Phase I jurisdiction under the residual designation authority.

*Phase II MS4 Permits*

The Phase II round of MS4 permits covered stormwater discharges other than the Phase I categories. 33 U.S.C. §1342(p)(6). Included in Phase II are MS4s serving fewer than 100,000 people, referred to as "small" MS4s. In 1999, the EPA adopted regulations setting forth permit requirements for small MS4s. *See* EPA Preamble to 1999 Phase II

75

MS4 Rule; *see also* 40 CFR §122.34.[78]  Those regulations provided deadlines for initial Phase II permit applications at various intervals during the early 2000s.

2.      Population Classification for Purposes of Phase I

As noted above, the Clean Water Act classifies MS4s according to the population served by the MS4.  The statute does not define what it means for an MS4 to "serve" a population of a given size.  In carrying out its statutory charge to adopt regulations on MS4 permit requirements,[79] the EPA defined "medium" MS4s as falling into one of four subcategories.  The most relevant here included systems comprising storm sewers that are:

> (i)  Located in an incorporated place with a population of 100,000 or more but less than 250,000, as determined by the latest Decennial Census by the Bureau of the Census (appendix G); or

> (ii) Located in the counties listed in appendix I, except municipal separate storm sewers that are located in the incorporated places, townships or towns within such counties;

40 CFR §122.26(b)(7)(i)-(ii) (as adopted in 1990).  Like the statute, the regulations on their face appear to use as a reference point the total population of the particular jurisdiction without attempting to refine that number according to the portion of the population that lives or works within the area "served" by the MS4.

---

[78] For reasons not relevant here, the 1999 small MS4 regulations were remanded and reissued in 2016.  *See Envtl. Def. Ctr., Inc. v. EPA*, 344 F.3d 832 (9th Cir. 2003) (remanding the 1999 regulations); EPA, *National Pollutant Discharge Elimination System (NPDES) Municipal Separate Storm Sewer System General Permit Remand Rule*, 81 Fed. Reg. 89320 (December 9, 2016).

[79] 33 U.S.C. §1342(p)(4).

Appendix I, referenced in the second subcategory of the regulation, listed 32 counties and was entitled "Counties With *Unincorporated Urbanized Areas* Greater Than 100,000, But Less Than 250,000 According to the Latest Decennial Census by the Bureau of the Census" (emphasis added). As is evident, the title of Appendix I refers not only to "unincorporated" areas, but also to "urbanized" areas – a term that does not appear in the statute or otherwise in the EPA's regulations.

In explanatory material that accompanied the 1990 publication of the Phase I regulations – what is sometimes referred to informally as a "preamble" to such a publication[80] – the agency elaborated on its conception of the second subcategory. It stated that the second subcategory was meant to capture MS4s in "counties having areas that are designated as urbanized areas by the latest decennial Bureau of Census estimates and where the population of such areas exceeds 100,000 [but is less than 250,000], after the population in the incorporated places, townships or towns within such counties is excluded." EPA Preamble to 1990 Phase I MS4 Rule, 55 Fed. Reg. at 48039.[81] As defined by the Census Bureau, the term "urbanized" generally refers to "high density development." *Id*. at 48041 n.5.

---

[80] See note 17 above.

[81] An EPA guidance document issued shortly after adoption of the Phase I regulations similarly stated the "medium" MS4 category included "Counties with *census designated urbanized* areas that have a population greater than [or] equal to 100,000 but less than 250,000 after incorporated areas, towns, and townships within such counties are excluded." EPA, Guidance Manual for the Preparation of Part 1 of MS4 Permit Applications (April 1991) at 9 (emphasis added).

In its initial iteration in connection with the regulations adopted in 1990, Appendix I listed jurisdictions in the second subcategory based on figures from the 1980 census – at that time "the latest decennial census" – as did Appendix G with respect to jurisdictions in the first subcategory. In 1999, at the same time that the EPA adopted regulations governing Phase II MS4 permits, the agency also updated Appendix I (as well as Appendix G) based on the 1990 census – which was then "the latest decennial census." But the EPA also amended the regulation concerning "medium" population jurisdictions to refer specifically to the 1990 census and deleted the reference to the "latest" census. The agency stated that it would not continue to update those appendices based on later decennial censuses. In the preamble to the publication of those regulations and amendments, the EPA explained that it was "freezing" the regulatory definition and listing based on the 1990 census because all the covered MS4s had already applied for permits and "the deadlines from the existing regulations have lapsed."[82] EPA Preamble to 1999 Phase II MS4 Rule, 64 Fed. Reg. at 68838, 68848-49. The EPA further explained that MS4s that later met the definition of a "medium" jurisdiction could be made subject to the Phase I requirements by the permitting agency, alluding to the agency's residual designation authority under the Act. *Id.* at 68749 ("the permitting authority can always require more from operators of MS4s serving 'newly over 100,000' populations"*)*; *see also* EPA, *National Pollutant Discharge Elimination*

---

[82] As noted earlier, at that time, Carroll and Frederick Counties were among those operators of MS4s that, at the behest of the Department, had already applied for, and received, Phase I permits, although they were not listed in Appendix I.

*System – Proposed Regulations for Revision of the Water Pollution Control Program Addressing Storm Water Discharges*, 63 Fed. Reg. 1536-01, 1567 (January 9, 1998).

   3.   Residual Designation Authority

   *Factors for Designation and Procedural Requirements*

As indicated above, the Act authorizes the EPA, or the pertinent state agency, to require that an MS4 obtain a Phase I permit if the agency "determines that the [MS4] contributes to a violation of a water quality standard or is a significant contributor of pollutants…." 33 U.S.C. §1342(p)(2)(E). In its Phase I permit regulations, the EPA identified the following factors that could affect such a determination: the location of the discharge, the size of the discharge, the nature and quality of the pollutants, and "other relevant factors." 40 CFR §122.26(a)(1)(v). Those regulations also specified certain procedures that would be followed by the EPA when the EPA itself made such a determination (as well as other types of case-by-case determinations). *See* 40 CFR §124.52.[83] No particular procedure was required of a *state* agency that made such a determination.[84] The parties have not presented – and we have not been able to identify –

_____

[83] In the context of a citizen petition to the EPA to exercise its residual designation authority, the EPA may issue a formal document concerning the water quality impacts by a stormwater discharger. *See Conservation Law Foundation, Inc. v. Pruitt*, 881 F.3d 24, 32 (1st Cir. 2018). However, the EPA's practice in that context does not establish any particular requirement for state agencies.

[84] The regulation requires the EPA Regional Administrator to send written notice of a designation by the Regional Administrator to the MS4, accompanied by an application form for a Phase I permit. The regulations further provide that the propriety of the

79

any further procedural or other requirements that a state must follow when designating an MS4 as a Phase I permittee.[85]

*Use of Residual Designation Authority to Expand the Phase I Universe*

The vast majority of the MS4s subject to the Phase I permit requirements have been brought into Phase I under the residual designation authority, rather than on the basis of population. In a 2000 report to Congress, the EPA stated that, of the 1,017 MS4s that were part of the Phase I program at that time (including Carroll and Frederick Counties), only 216 had been listed in the appendices to the 1990 and 1999 regulations, while 670 were co-permittees with a larger MS4 or had been designated separately for inclusion in the program. *See* EPA, Report to Congress on the Phase I Stormwater Regulations (2000), at 3-5, *available at* https://perma.cc/BJG3-TPWP. Thus, despite the fact that the listing of large and medium MS4s required to obtain Phase I permits in the appendices to the Phase

---

designation remains open for consideration during the notice and comment period relating to the permit.

    Prior to adoption of those regulations, a memorandum of the EPA's Office of Water Enforcement and Permits had appeared to indicate that state agencies would be expected to follow the same procedure. Memorandum of the Director of the EPA Office of Water Enforcement and Permits to Water Management Division Directors, et al. concerning Designation of Storm Water Discharges for Immediate Permitting (August 8, 1990), *available at* https://perma.cc/4NFA-NCXL, at 11. (Of note, that memorandum also suggested that discharges from the area around Chesapeake Bay would be appropriate for such a designation. *Id*. at 8-9). However, the regulations as adopted by the EPA set forth procedures solely for a designation by the EPA itself.

[85] As was the case with clause (B)(iii) concerning the application of the MEP standard, see Part II.B. of this Opinion above, the legislative history of §1342(p)(2)(E), which established the residual designation authority, is not particularly illuminating.

I regulations was "frozen" based on the 1990 census, that universe has been significantly expanded under the statutory designation authority. *See id*. at 3-2 n.7.[86]

4. Classification of Frederick County and Carroll County in the 1990s

Neither Frederick County nor Carroll County was included in the listing of jurisdictions deemed "medium" based on population in Appendix I to the EPA regulations – either in the initial version of that listing based on the 1980 census or in the amended version based on the 1990 census. Rather, the Department asked the Counties to apply for Phase I MS4 permits in the early 1990s, and the Counties did so. It is inevitably difficult to reconstruct events from the vantage point of 30 years later, but the parties have provided some correspondence from that era that suggests how the Department and the Counties came to accept the Counties' status as Phase I jurisdictions.[87]

After Congress added the MS4 permit requirement to the Act and the EPA first adopted the Phase I regulations in 1990, the Department began corresponding with the

---

[86] *See also* EPA, *Stormwater Phase II Final Rule: Who's Covered? Designation and Waivers of Regulated Small MS4s* (revised June 2012), at 2, *available at* https://perma.cc/7WFA-VTYG ("Phase I MS4s were *automatically* designated nationwide as medium MS4s ... or as large MS4s [based on population.] Many MS4s in areas below 100,000 in population, however, have been individually brought into the Phase I program [by] permitting authorities.") (emphasis added).

[87] This correspondence appears in appendices to the parties' briefs. There is no documentation in the administrative record of these permits as to how either County came to be treated as a Phase I jurisdiction in the 1990s. In the explanatory document that the Department issued with the final version of the most recent Frederick County permit, it indicated that it had not needed to exercise its residual designation authority to classify the County as a Phase I jurisdiction in the 1990s because the County had agreed to apply for a Phase I MS4 permit.

Counties about whether they had to apply for a permit. At first, the Department told the Counties it was "unclear" whether they would need to do so. Each County responded that its unincorporated population was below the statutory threshold of 100,000. Carroll County also emphasized its "primarily rural character."[88] Both Counties apparently asked the Department to refrain from including them in Phase I, or at least to delay the application of the Phase I requirements. The Department acceded to the latter request and postponed the deadlines for both Counties to submit a Phase I permit application. Both Counties eventually submitted applications for Phase I permits, apparently without further protest.

As best we can tell from the available correspondence, neither the Department nor the Counties focused on *urbanized* population in their correspondence when they discussed the relevant population in the early 1990s. This is perhaps unsurprising because neither the federal statutory nor regulatory text refers to "urbanized" areas.[89] Instead, in their correspondence, both the Counties and the Department discussed only total population and the population in unincorporated areas with respect to whether the Counties were "medium" MS4 jurisdictions that should apply for a Phase I permit.

---

[88] The fact that a county may have a large rural area does not necessarily affect whether it should be classified as a Phase I MS4 jurisdiction. *See* EPA Preamble to 1990 Phase I MS4 Rule, 55 Fed. Reg. at 48041 ("some of the counties addressed by [the Phase I regulations] have, in addition to areas with high unincorporated urbanized populations, areas that are essentially rural or uninhabited and may not be the subject of planned development").

[89] As explained above, that criterion was explained in the preamble to the publication of the 1990 Phase I regulations, but did not appear in the actual text of the regulations.

In the correspondence available to us, the Department did not explicitly invoke the statutory residual designation authority with respect to either County. However, the EPA has at least twice included Carroll County and Frederick County in lists of permittees as residually designated jurisdictions. EPA, *Final National Pollutant Discharge Elimination System Storm Water Multi-Sector General Permit for Industrial Activities*, 60 Fed. Reg. 50804, 51272 (September 29, 1995); EPA, *Storm Water Discharges Potentially Addressed By Phase II of National Pollutant Discharge Elimination System Storm Water Program: Report to Congress* (March 1995) at A-14; *see also* EPA, Report to Congress on the Phase I Storm Water Regulations (February 2000), at Apx. A (including Carroll County and Frederick County in Table A-2 listing "Additional MS4s Participating in Phase I MS4 Program" – *i.e.*, "additional" to Table A-1 listing the Phase I MS4 permittees named in the population-based appendices to the regulations).[90] There are also other indications, outlined below, that the Counties were regarded as residually designated Phase I jurisdictions in the 1990s.

---

[90] Similarly, the version of the Maryland WIP issued in 2010 stated that Carroll County had been designated by the Department as a Phase I MS4 under the residual designation authority in the early 1990s. *See* Maryland WIP at 2-30.

5.    Analysis

The Counties assert that they are not properly classified as Phase I MS4s because they are not "medium" jurisdictions and were not otherwise designated as Phase I jurisdictions by the Department in the early 1990s. They contend that they should not be considered "medium" jurisdictions. In their view, the list of jurisdictions in Appendix I to the Phase I regulations is the exclusive list of medium MS4 counties and neither County appears on that list. Moreover, the Counties assert that their unincorporated, *urbanized* populations never reached 100,000, either in the 1990s or recently.[91] They argue the Department did not exercise its residual designation authority in the 1990s, and Carroll County argues it is unlikely the Department even could have done so. In addition, Carroll County argues that the decision to include it as a Phase I jurisdiction was arbitrary and capricious.

So far as we can tell, the Counties' challenge to their MS4 classification as Phase I jurisdictions raises novel issues for this or any court. We have not found – nor have the parties cited – any case that involves a county's challenge to its classification as a Phase I MS4.

---

[91] Carroll County also claims that the Clean Water Act did not authorize the Department's use of population *projections* in the 1990s. We do not consider this argument separately because we do not see it as materially distinct from the County's other population-based arguments.

*Whether it is Unlawful for the Department to Treat the Counties as Phase I MS4s*

If the Counties had raised the question of their classification as Phase I jurisdictions in the early 1990s, we might well have agreed that they should not have been brought into Phase I as "medium" jurisdictions. However, the argument that Appendix I to the Phase I regulations is the exclusive list of "medium" Phase I jurisdictions is without merit, as the EPA itself has recognized that jurisdictions not listed could later qualify.[92] However, given the EPA's interpretation of its own regulations expressed in the preamble to the publication of the Phase I regulations in 1990, neither County likely met the EPA's contemporaneous interpretation of the medium category. In retrospect, it appears that neither County had a population at that time above 100,000 in unincorporated, *urbanized* areas.[93]

But we are not addressing this question in 1991.[94] We decline to hold that today, after nearly three decades as part of the Phase I permitting program, the Counties should

---

[92] As discussed above, the EPA "froze" the list in Appendix I in 1999 based on the 1990 census because the deadlines set for Phase I permit applications had expired and the pertinent jurisdictions had already applied (as had Carroll and Frederick Counties). The agency recognized that jurisdictions that later qualified as medium jurisdictions could be brought into the Phase I program through the residual designation authority. In any event, the agency could not, by regulation, negate a legislative determination that MS4s serving populations of a certain size were subject to the permit requirement.

[93] In 1990, Frederick County's "urbanized area" population was 58,393, and its total "urban" population was 86,686; for Carroll County, the numbers were 0 and 38,418, respectively. There is no need not explore the difference between "total urban" and "urbanized area," at least for 1990, since both figures were under 100,000 with respect to each County.

[94] Even if we could purport to be examining this issue from the perspective of the early 1990s, it is not entirely clear that we have a complete record from that period.

instead be relegated to a Phase II general permit with less stringent pollutant controls. We

reach this conclusion for several reasons:

- The approach taken by the Department in calculating the relevant population of the Counties in the early 1990s was arguably consistent with the statutory text and the text of the regulations, although it deviated from the EPA's interpretation of those regulations, as articulated in the preamble to the publication of the regulations.[95]

- When the Counties were originally treated as Phase I jurisdictions in 1991, neither County (nor apparently anyone else) questioned the method that the Department used to assess the relevant population.

- Both Counties stipulated, as recently as 2014, that they satisfy the statutory definition of a medium Phase I MS4 in consent orders that they entered into with the EPA concerning violations of earlier MS4 permits.[96]

- In the case of the Carroll County permit, all of the incorporated municipalities in the County are included as co-permittees on the County's Phase I permit, which thus regulates discharges of MS4s

---

[95] The Dissenting Opinion of Judge Getty suggests that we have deferred excessively to the EPA's and the Department's application of the Phase I classification, in contravention of the "plain language" of the Clean Water Act and the EPA's regulations concerning the classification of MS4s. Getty Dissenting slip op. at 8. However, neither the statutory nor regulatory text concerning Phase I jurisdictions refers to "urbanized" populations – the key language on which the Dissenting Opinion relies. *See* 33 U.S.C. §1342(p)(2); 40 CFR §122.26(a)(1)(iv). As explained in the text, that language appears solely in the title of an appendix and in explanatory material prepared by the agency (the preamble to the 1990 publication of the regulations).

[96] In the Matter of Carroll County, Maryland, *Consent Agreement and Final Order* (United States Environmental Protection Agency June 6, 2014) at ¶¶ 7, 14, 15; In the Matter of the Board of County Commissioners of Frederick County, Maryland, *Consent Agreement and Final Order* (United States Environmental Protection Agency November 25, 2014) at ¶¶ 8, 15, 16. Both orders recite that the pertinent County's "MS4 serves a population of at least 100,000," which is verbatim the language of the Clean Water Act defining medium Phase I jurisdictions. *See* 33 U.S.C. §1342(p)(2)(D).

serving those populations.  *See* Carroll County Phase I MS4 Permit MD0068331, Part I.B.; *see also* 40 CFR §122.26(a)(3).

- The record before us does not include any document in which the Department explicitly exercised its residual designation authority to designate the Counties as Phase I jurisdictions independent of their status as medium jurisdictions.  However, this is presumably because the Counties agreed to, or at least acquiesced in, their treatment as medium MS4s which may have foreclosed any need to invoke the Department's residual designation authority.

- There are noteworthy indications that the Department and EPA believed that the Counties were appropriately designated as Phase I jurisdictions:[97]

  o The Maryland WIP refers to Carroll County as a residually designated Phase I jurisdiction.  Maryland WIP at 2-30.

  o The fact that the Department agreed to delay the Counties' designation as Phase I jurisdictions suggests that it was acting, at least in part, under the residual designation authority, as the Phase I regulations refer to an agency authorizing a delay in the submission of an application only in the case of a residually designated Phase I jurisdiction.[98]

  o Given that TMDLs exist for waterways in both Counties – which indicates that water quality standards are being violated – there is a sound basis for concluding that discharges from each County's MS4 contribute to violations of water quality

---

[97] Carroll County asserts that, if the Department had acted under its residual designation authority, it was required to notify the County of its determination in writing and send an application form with that notice under 40 CFR §124.52.  However, as discussed above, the cited regulation applies only to a Regional Administrator of the EPA, not a state agency.  Even if the notification requirement applied to the Department, Carroll County does not explain why the Department's correspondence with the County in 1991 would not satisfy the requirement.  The regulation only requires that the permitting authority shall notify the permittee of the decision to require a permit and "the reasons for it."

[98] *See* 40 CFR §122.26(e)(5).

standards, thus triggering the exercise of the residual designation authority to include them as Phase I MS4 jurisdictions.

- o As indicated above, the EPA referred to the Counties as residually designated Phase I jurisdictions in publications in 1995 and 2000. A contemporaneous guidance document issued by the EPA identified jurisdictions in the Chesapeake Bay watershed as examples of appropriate exercise of residual designation authority. See note 84 above.

- ● Relegating the Counties from a Phase I permit to a Phase II permit with less stringent requirements at this juncture risks a violation of the anti-backsliding prohibition in the Clean Water Act.[99]  See 33 U.S.C. §1342(o).

The limited evidence of the Department's decision-making process in classifying these Counties as Phase I jurisdictions in 1991 may reflect the difficulty of responding to challenges raised more than 20 years after the fact. The delay by the Counties in raising this issue has also posed difficulties for this Court in evaluating the parties' arguments and the EPA's views of the issue. There is not a clear picture of how the Department's population-based reasoning in 1991 translated into the EPA's stated view in 1995 that the Department had used its residual designation authority.

What is clear, however, is that the Department had authority to classify the Counties as Phase I jurisdictions and, at least in the EPA's view, it did so. The Counties, in turn,

---

[99] The EPA had objected to earlier drafts of both permits on the basis that simply keeping the same terms of the Counties' prior Phase I permits "would constitute impermissible backsliding" in violation of the Act. See EPA, Specific Objection to Carroll County Phase I MS4 Permit MD0068331 (September 20, 2012) at 3; EPA, Specific Objection to Frederick County Phase I MS4 Permit MD0068357 (September 20, 2012) at 3.

have at the very least acquiesced in that classification since the 1990s. There is thus no question that the agencies charged with administering the Clean Water Act have consistently regarded the Counties as Phase I MS4s and that there is a reasonable basis for doing so. The Counties' delay in challenging their Phase I designation perhaps means that the Department did not exercise its designation authority more formally in the past, but that does not require that we direct that they now be treated as Phase II jurisdictions.

*Whether Carroll County's Classification is Arbitrary and Capricious*

As indicated in Part II.A. of this Opinion, the Department's exercise of discretion in crafting permit terms is subject to the "arbitrary and capricious" standard of review. The Department's decisions survive challenge under this standard so long as the Department had a rational basis for its actions.

Carroll County asserts that the Department acted arbitrarily and capriciously in classifying it as a Phase I MS4 jurisdiction. Its argument is largely based on comparing itself to other jurisdictions in Maryland that have been designated as Phase I and Phase II MS4s. Carroll County claims its treatment as a Phase I MS4 subjects it to the same effluent limitations as larger urban jurisdictions in Maryland, while other counties similar to it in population size and land use are subject to less stringent regulation as Phase II jurisdictions. In particular, it draws a comparison to Washington County, which has been designated as a small (Phase II) MS4 jurisdiction. Carroll County asserts that it is not challenging the

population categories in the Clean Water Act, but rather the different treatment of two similarly situated counties.[100]

In our view, the Department had a rational basis for making the impervious surface restoration terms more stringent for Phase I MS4s than for Phase II MS4s, even accounting for similarities between the smallest medium MS4s and the largest small MS4s. The Department notes that the population of Carroll County exceeded that of Washington County by a significant amount (when incorporated areas were excluded) at the time that the Department began to treat the counties as Phase I or Phase II jurisdictions. In addition, the Department's discretion in crafting MS4 permit terms is bounded by the Bay TMDL, the Maryland WIP, and the EPA.

In the Maryland WIP, the Department committed to including impervious surface restoration terms in MS4 permits similar to the ones the Department in fact included in the permits it issued after the EPA incorporated the Maryland WIP into the Bay TMDL. Moreover, the 30 percent restoration requirement for Phase I permittees inherently takes account of differences in the population size of those permittees. As the Department explained when it issued the Carroll County permit, "larger, more densely developed jurisdictions will have more impervious area and medium jurisdictions will have less impervious area that will require restoration." Basis for Final Determination to Issue

---

[100] In terms of the impervious surface restoration requirement, the Department designed the Phase I MS4 permits to be more stringent than Phase II MS4 permits in three ways: larger baseline (county-wide vs. urbanized areas), earlier deadline (2019 vs. 2025), and higher percentage of area to be restored (30% vs. 20%).

Carroll County's NPDES MS4 Permit MD0068331 (December 2014) at 29. Finally, in an objection to an earlier draft of the Carroll County permit, the EPA advised the Department that the impervious surface restoration term in the Carroll County permit should align with that in Prince George's County's permit, in order to comply with the Bay TMDL. EPA, Specific Objection to Carroll County Phase I MS4 Permit MD0068331 (September 20, 2012) at 3. Thus, the Department had a rational basis for the differences in permit terms between the Phase I and Phase II counties, even if some of them are close in population size and share some similar characteristics.

### E. *Whether the Permits Should Have Provided for Water Quality Trading*

"Water quality trading" is a method for complying with discharge permits that uses market forces to reduce overall pollution at lower cost by shifting pollution reduction activities from one entity to another. In particular, an entity subject to a pollution limit may take credit for a pollution reduction accomplished by another entity that it compensates for that privilege.[101] Such trading presumably happens only if the other entity is able to accomplish the pollution reduction at less cost than the entity subject to the pollution limit. Thus, if water quality trading is available as a compliance method in a permit, a permittee might satisfy part of its obligations under the permit by purchasing pollutant reduction credits from other entities that take certain pollutant-reducing actions.

---

[101] *See* EPA, *Water Quality Trading Evaluation* (October 2008), *available at* https://perma.cc/KT3P-WXRS, at 1-1; EPA, *Water Quality Trading Toolkit for Permit Writers* (updated June 2009), *available at* https://perma.cc/866S-M4V4, at 4.

The permits that are the subject of this appeal do not include water quality trading as a compliance method. The Counties wanted their permits to include water quality trading as a compliance option and contend that the Department's decision not to allow for water quality trading in the permits when they were issued in 2014 was arbitrary and capricious.

As the Counties point out, both the Department and the EPA support water quality trading as an option in discharge permits. Over the past several years, the Department has been developing a water quality trading program in Maryland. In December 2017, the Department proposed regulations to establish such a program. *See* 44:25 Md. Reg. 1189-95 (December 8, 2017). Following the requisite notice and comment period, the Department adopted those regulations, which became effective July 16, 2018. *See* 45:14 Md. Reg. 698-702 (July 6, 1018), *codified at* COMAR 26.08.11. In addition, on April 27, 2018, the Department issued a Phase II MS4 general permit,[102] effective October 31, 2018, which includes a term that conditionally allows water quality trading.[103] The Department

---

[102] While permits applicable to Phase I MS4s are usually customized for each jurisdiction, the Department has developed a less rigorous general permit for Phase II MS4s. *See* Maryland Department of the Environment, *Maryland's NPDES Municipal Separate Storm Sewer System (MS4) Phase II General Permits*, https://perma.cc/MLX2-5NDU; EPA, *Stormwater Discharges from Municipal Sources*, https://perma.cc/UBS6-NDK3.

[103] In pertinent part, the Maryland Phase II MS4 general permit provides: "[The Department] supports trading as a cost-effective means for achieving pollutant load reductions[, and t]herefore, trading with other source sectors may be an option after formal regulatory procedures are satisfied." National Pollutant Discharge Elimination System

did so because it anticipated that the final water quality trading regulations would be adopted in 2018, as indeed they were. *See* Basis for Final Determination to Issue the General Permit for Discharges from Small Municipal Separate Storm Sewer Systems (April 27, 2018) at 25.

The Counties argue that the Department also should have conditionally approved water quality trading in their permits, and that the failure to do so was arbitrary and capricious. We disagree. The Department issued these permits to the Counties in 2014, just a year after it had convened a stakeholder group charged with examining several fundamental issues about trading and making recommendations for a draft trading policy. The Department explicitly mentioned that ongoing review when it explained in the Basis for Determination as to each permit why the permit did not include water quality trading as a compliance mechanism. By 2018, however, when the Department was completing the Phase II MS4 general permit, it had already proposed trading regulations and reasonably anticipated that those regulations would be adopted by the time that permit was effective. The Department therefore had a rational basis for conditionally approving water quality trading in the Phase II MS4 general permit but not in the permits issued four years earlier to the Counties. *See Harvey v. Marshall*, 389 Md. at 297-99 (a "reasonable or rationally motivated" administrative decision is not "arbitrary or capricious.").

---

General Permit for Discharges from Small Municipal Separate Storm Sewer Systems (No. 13-IM-5500), at B-10.

93

Carroll County points out that, in order to add water quality trading to its permit now, it must pursue a permit modification and undergo what it characterizes as "a lengthy public participation process." But the County has not shown that any burden associated with the permit modification process would warrant a finding that the Department's decision *in 2014* not to include water quality trading was arbitrary and capricious.[104]

### F. *Effect of Permit Reference to Statutory Responsibilities of Other Entities*

One provision of the permits contains language that, in the view of Carroll County, impermissibly transfers statutory obligations of other governmental entities to the Counties. In particular, Part VI.B of each County's permit provides as follows:

> [The] County shall cooperate with other agencies during the completion of the Water Resources Element (WRE) as required by the Maryland Economic Growth, Resource Protection and Planning Act of 1992 (Article 66B, Annotated Code of Maryland). Such cooperation shall entail all reasonable actions authorized by law and *shall not be restricted by the responsibilities attributed to other entities by separate State statute, including but not limited to reviewing and approving plans and appropriating funds*.

(emphasis added).

---

[104] At least six other counties – including Frederick County – have requested that the Department modify their Phase I MS4 permits to incorporate the new water quality trading program as an option for complying with an impervious surface restoration requirement. We take judicial notice that the Department accepted those proposals and issued final determinations in December 2018 modifying the permits for Anne Arundel, Prince George's, and Baltimore counties; in July, the Department issued tentative modification determinations for Charles, Harford, and Frederick counties. *See* Maryland Department of the Environment, *Maryland's NPDES Municipal Separate Storm Sewer System (MS4) Permits*, https://perma.cc/KFY9-VBDU.

The law referenced in this part of the permits concerns how counties plan their future development. Now codified in Title 3 of the Land Use Article ("LU") of the Maryland Code, the pertinent provisions of the Economic Growth, Resource Protection and Planning Act, as amended, direct each county to develop a comprehensive plan that includes, among other things, "a water resources element." *See* LU §§3-101(a), 3-102(a)(1)(viii).[105] As part of the water resources element, a county must identify "suitable receiving waters and land areas to meet stormwater management and wastewater treatment and disposal needs of existing and future development." LU §3-106(a)(2).

Only Carroll County raises an issue on appeal concerning this provision of the permits.[106] In doing so, Carroll County contests only the language italicized in the quotation above. The County concedes that the EPA allows states to coordinate federal and state permitting requirements, as the Department attempts to do in requiring

---

[105] The Economic Growth, Resource Protection and Planning Act of 1992 was originally codified in Article 66B. Chapter 437, Laws of Maryland 1992. In 2006, the General Assembly enacted the "water resources element" requirement in Article 66B, §1.03(iii). Chapter 381, Laws of Maryland 2006. In 2012, the Legislature re-codified various provisions of Article 66B, including those concerning the water resources element requirement, as part of the new Land Use Article. Chapter 426, Laws of Maryland 2012.

[106] Frederick County challenged the same provision in its permit in the Circuit Court. The Circuit Court ruled that the Department could lawfully incorporate the cooperation requirement of the Land Use Article into the permit. It also held that the language italicized above seemed to require the County to disregard other State statutes, which would impermissibly amend the Land Use Article. The Department did not contest that ruling. For the reasons set forth in text, we agree that the permit term may not amend the Land Use Article and may not be construed to do so or to require the Counties to disregard any other laws.

cooperation with other agencies in this permit term.[107]  The County argues, however, that the italicized language "seems to purport that the comprehensive planning provision overrides all other State statutes and relieves other entities of responsibilities attributed to them by State statute, instead imposing those responsibilities on the County."

Although the Department admits that the language is opaque, it asserts that the purpose of the final clause of this permit term "is to make clear that the County, when formulating the water resources element of its comprehensive plan, may not decline to cooperate with another agency because that agency, and not the County, has statutory responsibility for a specific governmental activity, whether it be reviewing and approving plans or appropriating funds."  In that view, this provision only precludes the County from relying on other agencies' specific responsibilities as a reason not to coordinate with those agencies.

In our view, the County's interpretation is not a reasonable reading of the permit provision.  Some ambiguity arguably exists in the closing phrase of the permit provision: "including but not limited to reviewing and approving plans and appropriating funds."  At least in terms of grammar, what "including" modifies is not obvious.  It could modify the County's "cooperation," its "reasonable actions," or the other entities' "responsibilities."  By the last antecedent rule, however, "including" would ordinarily be understood to modify

---

[107] *See* EPA Preamble to 1999 Phase II MS4 Rule, 64 Fed. Reg. at 68739 (discharge "permits may incorporate the requirements of existing State ... programs, thereby accommodating State[s] ... seeking to coordinate the storm water program with other programs").

"responsibilities." *See McCree v. State*, 441 Md. 4, 21 (2014) ("Under the last antecedent rule, a qualifying clause ordinarily is confined to the immediately preceding word or phrase") (internal quotations omitted). That reading makes the most sense here.

The provision says only that other entities' statutory requirements "shall not ... restrict" the County's obligation under State law to cooperate with those entities. This permit term has no effect on statutory requirements pertaining to other entities, nor does it transfer those obligations to the County. In other words, the permit term provides that the responsibilities of other entities under State law to take such actions as "reviewing and approving plans [or] appropriating funds" do not restrict the County's obligation to cooperate with those entities. Reasonably read, the permit term incorporates existing State law without imposing new requirements on the County or relieving other entities of their obligations under State law.

### III

### Conclusion

For the reasons set forth above, we hold:

(1)  The Department may lawfully include an impervious surface restoration requirement in an MS4 permit without reference to the MEP standard. The Department's decision to do so in Frederick County's most recent permit was not arbitrary or capricious.

(2)  The Department may lawfully include an impervious surface restoration requirement in an MS4 permit in which the required amount of restoration is based on the amount of unrestored surface throughout the county that operates the MS4 when the amount of restoration derives from commitments made in the Maryland WIP as part of the

97

development of the Chesapeake Bay TMDL.  To the extent that the Counties challenge restoration provisions in their permits that derive from EPA-approved local TMDLs, such challenges should have been made when the local TMDL was approved by the EPA and are not appropriately part of judicial review of an MS4 permit in State court.

(3)     The Department had authority to treat Frederick County and Carroll County as Phase I jurisdictions for purposes of their MS4 permits.  It was not arbitrary or capricious for the Department to classify Carroll County as a Phase I jurisdiction without also including Washington County in that category.

(4)     Although the Department later elected to include "water quality trading" as a compliance method for MS4 permittees, it was not arbitrary or capricious for the Department to refrain from doing so in the Counties' 2014 permits because it had not yet finally adopted regulations it had proposed concerning that compliance method.

(5)     A somewhat ambiguous provision in the Carroll County MS4 permit that requires it to cooperate with other agencies in the development of the water resources element of the County's comprehensive plan under LU §3-101 *et seq.* did not – and could not – transfer the responsibilities of those agencies to the County.

After all the jargon, technical analysis, and regulatory provisions have been digested and applied, it seems fitting to conclude with the words of Judge Wilkinson in a recent case concerning the operation and financing of an MS4 in the Chesapeake Bay region:

"No one is so naïve as to believe that the Chesapeake Bay [and its tributaries] can be restored to the pristine condition … in which this country's earliest inhabitants found them.  We would be fortunate to preserve a wholesome fraction of what once there was.

98

This case is but a tiny chapter in the story of our nation's effort to reconcile the just demands of development with the imperative of preserving an environment that can help make productive enterprise worth having.... We happily accepted the abundance that came down from our forebears. How then can we impoverish the environment for those who come after?"[108]

**IN NO. 5, JUDGMENT OF THE CIRCUIT COURT FOR CARROLL COUNTY AFFIRMED IN PART AND REVERSED IN PART. COSTS TO BE SPLIT EVENLY BETWEEN THE PARTIES.**

**IN NO. 7, JUDGMENT OF THE CIRCUIT COURT FOR FREDERICK COUNTY AFFIRMED IN PART AND REVERSED IN PART. COSTS TO BE SPLIT EVENLY BETWEEN THE PARTIES.**

---

[108] *Norfolk Southern*, 916 F.3d at 325 (Wilkinson, J., concurring).

Circuit Court for Carroll County
Case No. 06-C-15-068141

Circuit Court for Frederick County
Case No. 10-C-15-000293

Argued: September 13, 2018

———————————————————————

MARYLAND DEPARTMENT OF THE
ENVIRONMENT
v.
COUNTY COMMISSIONERS OF CARROLL
COUNTY, MARYLAND

———————————————————————

FREDERICK COUNTY, MARYLAND
v.
MARYLAND DEPARTMENT OF THE
ENVIRONMENT

———————————————————————

Barbera, C.J.
*Greene
*Adkins
McDonald
Watts
Hotten
Getty,

JJ.

———————————————————————

Dissenting Opinion by Watts, J., which Hotten and
Getty, JJ., joins.

———————————————————————

Filed: August 6, 2019

*Greene and Adkins, JJ., now retired, participated in
the hearing and conference of this case while active
members of this Court; after being recalled pursuant
to the Maryland Constitution, Article IV, Section 3A,
they also participated in the decision and adoption of
this opinion.

Respectfully, I dissent. Although I agree with the Majority that it was not arbitrary and capricious for the Maryland Department of the Environment ("the MDE") not to include water quality trading as a compliance method in the municipal separate storm sewer system ("MS4") permits of Carroll County and Frederick County, I disagree with the Majority as to the other issues. See Maj. Slip Op. at 97-98. I would hold that the MDE was not authorized to set forth in Frederick County's MS4 permit requirements that exceed the "maximum extent practicable" standard, that the MDE lacked the authority to require the Counties to restore 20% of the impervious surfaces[1] throughout the entirety of each county, and that the MDE misclassified the Counties' MS4s as medium rather than small.[2]

Under 33 U.S.C. § 1311(a)—part of the Clean Water Act, 33 U.S.C. §§ 1251-1388—generally, it is illegal to discharge pollutants into navigable waters. That said, the Environmental Protection Agency ("the EPA")—or, under certain circumstances, a State environmental agency, such as the MDE—may issue a permit for the discharge of pollutants into navigable waters. See 33 U.S.C. § 1342(a)(1), (b). For example, the MDE may issue to a county a permit for an MS4. See 33 U.S.C. § 1342(p)(3)(B). 33 U.S.C. § 1342(p)(3)(B) states:

---

[1]"'Impervious surface' means a surface that does not allow stormwater to infiltrate into the ground." Md. Code Ann., Env't (1987, 2013 Repl. Vol.) ("EN") § 4-201.1(d)(1). "'Impervious surface' includes rooftops, driveways, sidewalks, or pavement." EN § 4-201.1(d)(2).

[2]Because I agree with Frederick County that the MDE was not authorized to set forth in Frederick County's MS4 permit requirements that exceed the "maximum extent practicable" standard, there is no need to address Frederick County's alternative argument that its MS4 permit's requirements are impossible to fulfill. Similarly, although I disagree with the Majority as to the issue regarding Carroll County's cooperation with other State agencies, it is not necessary to go into detail in light of my positions on the other issues.

Permits for discharges from municipal storm sewers--

(i) may be issued on a system- or jurisdiction-wide basis;

(ii) shall include a requirement to effectively prohibit non-stormwater discharges into the storm sewers; and

(iii) shall require controls to reduce the discharge of pollutants to the maximum extent practicable, including management practices, control techniques and system, design and engineering methods, and such other provisions as the [EPA] or the State determines appropriate for the control of such pollutants.[3]

On brief, the MDE does not deny that it set forth in Frederick County's MS4 permit requirements that exceed the "maximum extent practicable" standard. To the contrary, the MDE contends that it was authorized to impose on Frederick County requirements that go beyond the "maximum extent practicable" standard.

I disagree, and would conclude that 33 U.S.C. § 1342(p)(3)(B)(iii)'s plain language establishes that the MDE is authorized only to require Frederick County "to reduce the discharge of pollutants to the maximum extent practicable[.]" In other words, in 33 U.S.C. § 1342(p)(3)(B)(iii), the "such other provisions" language does not authorize the MDE to impose on Frederick County requirements that exceed the "maximum extent practicable" standard. In 33 U.S.C. § 1342(p)(3)(B)(iii), every single item in question—namely, "management practices, control techniques and system, design and engineering methods,

---

[3]Consistent with 33 U.S.C. § 1342(p)(3)(B)(iii), 40 C.F.R. § 122.26(d)(2)(iv) states that "[a] proposed management program" to control pollutants from an MS4 "shall include a comprehensive planning process which involves public participation and where necessary intergovernmental coordination, to reduce the discharge of pollutants to the maximum extent practicable using management practices, control techniques and system, design and engineering methods, and such other provisions which are appropriate."

and such other provisions as the [EPA] or the State determines appropriate for the control of such pollutants"—is part of a list of "controls to reduce the discharge of pollutants to the maximum extent practicable[.]"  In short, in 33 U.S.C. § 1342(p)(3)(B)(iii), the "such other provisions" language is subject to the "maximum extent practicable" standard. Nothing in 33 U.S.C. § 1342(p)(3)(B)(iii) indicates that the "such other provisions" language grants the MDE freewheeling authority to impose on the Counties whatever requirements that it deems "appropriate[,]" no matter how onerous or costly.[4]

This interpretation of 33 U.S.C. § 1342(p)(3)(B)(iii) is warranted not only by its plain language, but also by our case law.  Just three years ago, in Md. Dep't of Env't v. Anacostia Riverkeeper, 447 Md. 88, 126, 134 A.3d 892, 915 (2016), this Court unanimously held that the requirement to restore 20% of impervious surfaces in multiple counties' MS4 "[p]ermits complies with the [maximum extent practicable] standard" under 33 U.S.C. § 1342(p)(3)(B)(iii).  In so holding, this Court rejected environmental groups' contention "that the 20% restoration requirement is too opaque to comply with 33 U.S.C. § 1342(p)(3)(B)(iii), the [maximum extent practicable] standard."  Id. at 123, 134 A.3d at 913.  This Court pointed out "that **MS4s are subject to the [maximum extent practicable] standard** under 33 U.S.C. § 1342[(p)(3)(B)(iii)]."  Id. at 104, 134 A.3d at 901 (emphasis added).  Similarly, this Court noted that 33 U.S.C. § 1342(p)(3)(B)(iii)

---

[4]After an examination of a statute's language, it is permissible to consider the statute's "legislative history as a confirmatory process."  Gomez v. Jackson Hewitt, Inc., 427 Md. 128, 160, 46 A.3d 443, 462 (2012) (citation omitted).  But, as the Majority notes, "what legislative history exists is not especially illuminating on the role of the [maximum extent practicable] standard."  Maj. Slip Op. at 44 (cleaned up).

"**requires 'controls to reduce the discharge of pollutants' to the [maximum extent practicable.]**" Id. at 177, 134 A.3d at 945 (emphasis added). And, this Court stated that "stormwater management programs that are designed by regulated parties must, in every instance, be subject to meaningful review by an appropriate regulating entity to ensure that each such program **reduces the discharge of pollutants to the maximum extent practicable.**" Id. at 157, 134 A.3d at 933 (cleaned up) (emphasis added).

This Court's holding in Anacostia Riverkeeper, id. at 126, 134 A.3d at 915, was premised on the principle—expressed multiple times throughout the opinion—that MS4 permits are subject to the "maximum extent practicable" standard under 33 U.S.C. § 1342(p)(3)(B)(iii). Accordingly, Anacostia Riverkeeper forecloses the MDE's contention that 33 U.S.C. § 1342(p)(3)(B)(iii) allows it to impose on Frederick County requirements that exceed the "maximum extent practicable" standard. If the MDE's position were valid, then this Court's holding in Anacostia Riverkeeper, id. at 126, 134 A.3d at 915, would have been completely meaningless; after all, if the MDE were free to ignore the "maximum extent practicable" standard when issuing MS4 permits, why would this Court have bothered to determine whether the MS4 permits complied with the "maximum extent practicable" standard?

Seeking to get around the obstacle that Anacostia Riverkeeper poses to its position, the MDE sets forth a novel theory—namely, that the "maximum extent practicable" standard is a "floor" rather than a "ceiling," and that Anacostia Riverkeeper does not indicate that the MDE may not impose requirements that go beyond the "maximum extent practicable" standard. The Majority essentially goes along with the MDE's interpretation

of Anacostia Riverkeeper, reasoning that, in Anacostia Riverkeeper, "the question was whether the impervious surface restoration requirement *satisfied* the [maximum extent practicable] standard whereas in this case the question is whether it *unlawfully exceeds* it." Maj. Slip Op. at 39 (emphasis in original). The view of the Majority and the MDE is simply incompatible with this Court's holding in Anacostia Riverkeeper, 447 Md. at 126, 134 A.3d at 915, which, to reiterate, was squarely based on the principle that MS4 permits must comply with the "maximum extent practicable" standard. If MS4 permits did not need to comply with the "maximum extent practicable" standard, this Court would have had no reason to determine that the requirement to restore 20% of impervious surfaces in multiple counties' MS4 "[p]ermits complies with the [maximum extent practicable] standard" under 33 U.S.C. § 1342(p)(3)(B)(iii). Anacostia Riverkeeper, 447 Md. at 126, 134 A.3d at 915.[5]

---

[5]Perplexingly, the majority opinion states that, in Anacostia Riverkeeper, 447 Md. at 122-26, 134 A.3d at 912-15:

> [T]he Court considered a permit term that appears in Phase I MS4 permits of five other jurisdictions and that is *identical* to the permit term that Frederick County challenges here. The Court held that the term was valid and authorized by the Clean Water Act. If we were simply to recite the holding of *Anacostia Riverkeeper* and stop, Frederick County loses.

Maj. Slip Op. at 38 n.41 (cleaned up) (emphasis in original). Essentially, after asserting that, in Anacostia Riverkeeper, this Court answered a question that is not at issue in this case, oddly, the majority opinion asserts that, under the holding of Anacostia Riverkeeper, Frederick County would "lose[.]" Maj. Slip Op. at 38 n.41. In actuality, the circumstance that, in Anacostia Riverkeeper, this Court considered a permit term that is identical to a term in the permit that Frederick County challenges informs the outcome of this case. In Anacostia Riverkeeper, 447 Md. at 126, 134 A.3d at 914-15, this Court concluded that the challenged permit term complied with the "maximum extent practicable" standard. In Anacostia Riverkeeper, id. at 123-26, A.3d at 913-15, there was no allegation that the permit term exceeded the "maximum extent practicable" standard. Frederick County

- 5 -

To be sure, as Frederick County acknowledges, its interpretation of 33 U.S.C. § 1342(p)(3)(B)(iii) indicates that the statute contains a typographical error—namely, the word "system" should be "systems" so that it, like the immediately preceding noun "techniques," is plural. It is not unheard of for a statute to contain a typographical error. Indeed, another sentence within 33 U.S.C. § 1342 contains three such errors; 33 U.S.C. § 1342(l)(3)(C) erroneously refers to "Section 1365(a) of this title" (in which "Section" should be lowercase), and, in two instances, erroneously omits the word "section" before referring to a certain provision "of this title[.]"

Helpfully, the Majority sets forth illustrations of how each party parses the sentence within 33 U.S.C. § 1342(p)(3)(B)(iii). See Maj. Slip Op. at 41-43. As the Majority notes, Frederick County parses that sentence, in pertinent part, as follows: "shall require controls to reduce the discharge of pollutants to the maximum extent practicable, including (1) management practices, (2) control techniques and systems, (3) design and engineering methods, and (4) such other provisions as the [EPA] Administrator or the State determines appropriate for the control of such pollutants." Id. at 41 (alterations in original). Meanwhile, the MDE parses the sentence, in pertinent part, as follows: "shall require (1) controls to reduce the discharge of pollutants to the maximum extent practicable, including (a) management practices, (b) control techniques and (c) system, design and engineering methods, and (2) such other provisions as the [EPA] Administrator or the State determines

_____

would not "lose[]" under this Court's holding in Anacostia Riverkeeper, Maj. Slip Op. at 38 n.41; rather, this Court's holding in that case clearly demonstrates that MDE has exceeded its authority.

- 6 -

appropriate for the control of such pollutants." Id. at 42 (alterations in original). The Majority adopts the MDE's interpretation of 33 U.S.C. § 1342(p)(3)(B)(iii), reasoning that it "does not require revision of the text itself, and groups items that could comfortably fit within the category of 'controls' separately from the final clause's vaguer and seemingly broader reference to 'appropriate … provisions.'" Maj. Slip Op. at 42-43 (ellipsis in original).

The Majority fails to address three matters that demonstrate that the MDE's interpretation of 33 U.S.C. § 1342(p)(3)(B)(iii) is incorrect. Specifically, the MDE's interpretation renders most of the sentence at issue nugatory, leads to an illogical result, and indicates that the sentence has not one, but two glaring errors. These circumstances violate the rules of statutory interpretation, under which a court must read a statute "as a whole so that no word, clause, sentence or phrase is rendered surplusage, superfluous, meaningless[,] or nugatory[,]" and must read the statute "to avoid an illogical result." Gomez v. Jackson Hewitt, Inc., 427 Md. 128, 143, 156, 46 A.3d 443, 452, 460 (2012) (cleaned up).

If, as the MDE asserts, 33 U.S.C. § 1342(p)(3)(B)(iii) directs it to "require . . . such other provisions as [it] determines appropriate for the control of such pollutants[,]" then the rest of the provision is nugatory. Under the MDE's interpretation, the "such other provisions" language allows it to impose on the Counties whatever provisions it "determines appropriate[,]" without reference to the "maximum extent practicable" standard. That begs the question: If the MDE may freely ignore it, what is the point of the "maximum extent practicable" standard? In fact, what is the point of the list of items that

- 7 -

begins with "management practices"? Simply put, there would be no reason for either the "maximum extent practicable" standard or the list of items if 33 U.S.C. § 1342(p)(3)(B)(iii) directs the MDE to impose whatever requirements it deems fit, whether "practicable" or not.

The MDE volunteers a possible reason for the "maximum extent practicable" standard—but that reason reveals an internal inconsistency in the MDE's contentions. The MDE reasons that the "maximum extent practicable" standard is a "floor" rather than a "ceiling." In other words, according to the MDE, the "maximum extent practicable" standard sets forth the minimum that the MDE must require of Frederick County, not the maximum that it may require of Frederick County. That argument, however, is inconsistent with the MDE's assertion that the "such other provisions" language is not subject to the "maximum extent practicable" standard. If, as the MDE maintains, the "such other provisions" language is independent of the "maximum extent practicable" standard, then the "maximum extent practicable" standard is neither a floor nor a ceiling—it is meaningless, as the MDE is free to impose whatever requirements it deems fit, whether practicable or not.

The Majority refers to the "such other provisions" language as the "final clause[.]" Maj. Slip Op. at 43. I agree with the Majority that the "such other provisions" language is the final clause—and, moreover, it is clear that the final clause is a catchall clause that supports Frederick County's interpretation of 33 U.S.C. § 1342(p)(3)(B)(iii), not the MDE's. Under Frederick County's position, there are four groups of controls that may be included in an MS4 permit, including a final catchall category—the "such other provisions"

clause—that are all governed by the "maximum extent practicable" standard. Under the MDE's position, the "such other provisions" language is an all-encompassing blank check that sidesteps the "maximum extent practicable" standard and allows the MDE to impose any requirement that it "determines appropriate[.]" Because the MDE's interpretation of 33 U.S.C. § 1342(p)(3)(B)(iii) renders most of the statutory provision nugatory, I cannot endorse it.

Additionally, the MDE's interpretation of 33 U.S.C. § 1342(p)(3)(B)(iii) leads to an illogical result. As the Majority notes, under Frederick County's interpretation of 33 U.S.C. § 1342(p)(3)(B)(iii), the list of items includes "control techniques and systems" and "design and engineering methods[.]" Maj. Slip Op. at 41 (alteration in original). This explanation is logical, as the term "control systems" makes as much sense as the term "control techniques[.]" By contrast, under the MDE's interpretation, the list of items includes "control techniques" and "system, design and engineering methods[.]" Id. at 42. I am unable to fathom what exactly "system methods" are. The Majority acknowledges that Frederick County refers to the term "system methods" as "nonsensical[,]" id. at 42, yet the Majority makes no effort to explain what the term means. Simply put, the term "system methods" is indeed nonsensical, in sharp contrast to the terms "design methods" and "engineering methods[.]" Adopting Frederick County's interpretation of 33 U.S.C. § 1342(p)(3)(B)(iii) avoids the illogical result of construing the statute to refer to "system methods"—an incomprehensible term.

Finally, the MDE's interpretation of 33 U.S.C. § 1342(p)(3)(B)(iii) indicates that the sentence has not one, but two glaring errors. Specifically, under the MDE's position,

the sentence would be missing two serial commas:[6] one after the word "techniques[,]" and one after the word "design[.]"  To be sure, as noted above, it is not unheard of for a statute to contain a typographical error; and, the inclusion of serial commas is a matter of style rather than a grammatical necessity.  Even so, independent of 33 U.S.C. § 1342(p)(3)(B)(iii), the rest of the statute includes fourteen serial commas in all.  See 33 U.S.C. § 1342(a)(1), (a)(2), (b)(1)(A), (b)(2)(B), (b)(9), (f), (g) (twice, counting the title), (k), (l)(2) (twice, counting the title), (q)(1) (title), (q)(3), (s)(3)(A)(ii).  And, unlike the practice of including the lowercase word "section" when drafting a statute that refers to other statutes, see 33 U.S.C. § 1342(l)(3)(C), the practice of including a serial comma is not unique to legal writing, and is often a habit that becomes ingrained as a result of years of day-to-day writing.  Accordingly, it is difficult to believe that 33 U.S.C. § 1342(p)(3)(B)(iii)'s drafters simply forgot to include a serial comma in not one, but two instances.

Without meaningfully addressing the fatal flaws in the MDE's interpretation of 33 U.S.C. § 1342(p)(3)(B)(iii) and its conflict with this Court's holding in Anacostia Riverkeeper, 447 Md. at 126, 134 A.3d at 915, the Majority quotes an opinion by one of California's six intermediate appellate courts.  See Maj. Slip Op. at 43.  In Bldg. Indus. Ass'n of San Diego Cty. v. State Water Res. Control Bd., 124 Cal. App. 4th 866, 882-83

---

[6]Also known as a Harvard comma or an Oxford comma, a serial comma is "a comma [that is] used to separate the second-to-last item in a list from a final item [that is] introduced by the conjunction *and* or *or*[.]"  Serial Comma, Merriam-Webster, https://www.merriam-webster.com/dictionary/serial%20comma [https://perma.cc/3KGX-2LJC] (italics in original).  For example, the phrase "red, white, and blue" includes a serial comma. Id.

(2004), the Fourth District Court of Appeal of California reasoned that the "such other provisions" language in 33 U.S.C. § 1342(p)(3)(B)(iii) directs State environmental agencies to impose whatever requirements they determine appropriate, without reference to the "maximum extent practicable" standard. The California Court agreed with the contention of State water boards and environmental organizations that, "given the absence of a comma after the word 'techniques,'" and "because the word 'system' [] is singular, it necessarily follows from parallel-construction grammar principles that the word 'system' is part of the phrase 'system, design and engineering methods' rather than the phrase 'control techniques and system.'" Id.

The California Court's logic is unpersuasive for several reasons. First and foremost, the California Court treated the lack of a comma after the word "techniques" as an indication that the words "techniques" and "system" do not go together—when, in fact, the exact opposite is true; i.e., the lack of a comma between the words "techniques" and "system" indicates that, indeed, the words go together. On a related note, for all its concern about the lack of a comma after the word "techniques[,]" the California Court failed to acknowledge that its interpretation of 33 U.S.C. § 1342(p)(3)(B)(iii) meant that there should have been a serial comma after the word "techniques"—as well as a serial comma after the word "design[.]" Also, the California Court did not mention the possibility that the word "system" is singular due to a typographical error. Nor did the California Court acknowledge that its interpretation of 33 U.S.C. § 1342(p)(3)(B)(iii) renders most of the sentence, including the "maximum extent practicable" standard, nugatory. Nor did the California Court mention that its interpretation of 33 U.S.C. § 1342(p)(3)(B)(iii) indicates

- 11 -

that the statute includes the nonsensical term "system methods"—much less attempt to explain what that term means.

In addition to quoting Bldg. Indus. Ass'n of San Diego Cty., the Majority gives deference to the EPA's interpretation of 33 U.S.C. § 1342(p)(3)(B)(iii), under which the MDE may impose on Frederick County requirements that exceed the "maximum extent practicable" standard. See Maj. Slip Op. at 50-51. Although a court should give some deference to an administrative agency's interpretation of a statute that it administers, the court is not obligated to adopt a statutory construction that renders most of the statute meaningless and leads to an illogical result. In a nutshell, even after giving some deference, I would decline to adopt the EPA's strained interpretation of 33 U.S.C. § 1342(p)(3)(B)(iii).[7]

---

[7]In a futile attempt to bootstrap deference to the EPA's interpretation of the Clean Water Act, the Majority relies on case law that does not apply—Chevron, U.S.A., Inc. v. Nat. Res. Defense Council, Inc., 467 U.S. 837 (1984)—and an opinion from the United States Court of Appeals for the Ninth Circuit—Defs. of Wildlife v. Browner, 191 F.3d 1159 (9th Cir. 1999)—that does not address the issue that is before this Court. See Maj. Slip Op. at 48 n.52. As to Defs. of Wildlife, the Majority states: "[W]hile the Ninth Circuit did not agree with the EPA's existing construction, it nevertheless recognized that a permitting agency had discretion to include permit terms based on water quality standards." Maj. Slip Op. at 46-47. As the Majority appears to recognize, the relevant question before the Ninth Circuit was whether the Clean Water Act authorized the EPA to "require strict compliance with [S]tate water-quality standards[.]" Defs. of Wildlife, 191 F.3d at 1166. The Ninth Circuit answered that question in the affirmative, explaining that 33 U.S.C. § 1342(p)(3)(B)(iii) "gives the EPA discretion to determine what pollution controls are appropriate." Id. Significantly, nowhere in Defs. of Wildlife did the Ninth Circuit indicate that 33 U.S.C. § 1342(p)(3)(B)(iii) authorizes the EPA—or a State environmental agency—to impose whatever requirements it determines appropriate, without reference to the "maximum extent practicable" standard. Indeed, in two instances, the Ninth Circuit recognized that, under 33 U.S.C. § 1342(p)(3)(B)(iii), local governments

In addition to wrongfully setting forth in Frederick County's MS4 permit requirements that exceed the "maximum extent practicable" standard, the MDE improperly required the Counties to restore 20% of the impervious surfaces throughout the entirety of each county, as opposed to 20% of the impervious surfaces in the Counties' urbanized

that manage MS4s must "reduce the discharge of pollutants to the maximum extent practicable[.]" Id. at 1165 (internal quotation marks omitted).

As a matter of fact, contrary to the Majority's assertion that "[o]ther courts have pointed to *Defenders of Wildlife* as setting forth the discretion that the EPA (and state permitting agencies) have in drafting MS4 permit terms to require pollution controls that satisfy the ['maximum extent practicable'] standard or a more demanding water quality based standard[,]" that is not the case. See Maj. Slip Op. at 47 n.50. Although the Ninth Circuit's opinion in Defs. of Wildlife was mentioned in each of the cases that the Majority identifies, none of those cases relied on Defs. of Wildlife as a basis for concluding that the EPA or State environmental agencies have the discretion to issue MS4 permits that contain requirements that exceed the "maximum extent practicable" standard. In actuality, in each of those cases, the courts relied on Defs. of Wildlife for other propositions. See Nat. Res. Def. Council v. New York State Dep't of Envtl. Conservation, 994 N.Y.S. 2d 125, 135 (N.Y. App. 2014) (The New York Supreme Court relied on Defs. of Wildlife for the specific proposition that permits issued for "industrial dischargers" must comply with the effluent limitations set forth in 33 U.S.C. § 1311.); Conservation Law Found., Inc. v. Boston Water and Sewer Comm'n, 2010 WL 5349854, at *5-6 (D. Mass. 2010) (unreported) (The U.S. District Court for the District of Massachusetts relied on Defs. of Wildlife for the proposition that the EPA has the authority to "determine that ensuring strict compliance with state water-quality standards is necessary to control pollutants" and the proposition that the EPA has the authority to "require less than strict compliance with state water-quality standards."); Tualatin Riverkeepers v. Oregon Dep't of Envtl. Quality, 230 P.3d 559, 562 n.8 (Ore. App. 2010) (The Court of Appeals of Oregon relied on Defs. of Wildlife for the proposition that permits providing for discharges of municipal storm water "need not require strict compliance with state water quality standards."); City of Arcadia v. State Water Res. Control Bd., 135 Cal. App. 4th 1392, 1429 (2006) (The Court of Appeal for the Fourth District of California relied on Defs. of Wildlife for the proposition that the EPA has the discretion to "'determine that ensuring strict compliance with state water-quality standards is necessary to control pollutants'" and that the EPA also has the authority to "'require less than strict compliance with state water-quality standards[.']" (Quoting Defs. of Wildlife, 191 F.3d at 1166-67)). Nowhere in any of these cases did the various courts conclude that Defs. of Wildlife established the EPA's—or State environmental agencies'—authority to issue MS4 permits that contain requirements exceeding the "maximum extent practicable" standard.

- 13 -

areas—*i.e.*, the areas that the Counties' MS4s serve. As noted above, 33 U.S.C. § 1342(p)(3)(B)(iii) provides that MS4 permits "shall require controls to reduce the discharge of pollutants to the maximum extent practicable, including management practices, control techniques and system, design and engineering methods, and such other provisions as the [EPA] or the State determines appropriate for the control of such pollutants." Pursuant to 33 U.S.C. § 1342(p)(3)(B)(iii), see Anacostia Riverkeeper, 447 Md. at 151 n.71, 134 A.3d at 930 n.71, on December 3, 2010, multiple State agencies, including the MDE, submitted to the EPA "Maryland's Phase I Watershed Implementation Plan for the Chesapeake Bay Total Maximum Daily Load[.]" University of Maryland et al., Maryland's Phase I Watershed Implementation Plan for the Chesapeake Bay Total Maximum Daily Load at 1 (Dec. 3, 2010), available at https://mde.maryland.gov/programs/Water/TMDL/ Documents/www.mde.state.md.us/assets/document/MD_Phase_I_Plan_12_03_2010_Sub mitted_Final.pdf [https://perma.cc/XV7P-P3VT] ("the WIP"). In the WIP, under the heading "Additional Program, Practices and Policies to Meet the 2017 Goal for Non-Point Source Urban Stormwater[,]" and under the subheading "Increase [National Pollutant Discharge Elimination System ('NPDES')] Watershed Restoration Requirements for MS4 Phase I County permits, including [State Highway Administration,]" the State agencies stated:

> The following key elements of the strategy support reasonable assurance of the implementation of this element of the [WIP]: [] Establish impervious acreage treatment requirements in NPDES []MS4[] permits to achieve specific reductions in sediment, phosphorus and nitrogen consistent with this [WIP]. These permits will require the development of a detailed watershed restoration strategy that contains the following elements: . . . Completion of restoration efforts for twenty percent of the counties' impervious surface area

- 14 -

that is not already restored to the maximum extent practicable[].

WIP at 5-30 (paragraph breaks omitted).

Consistent with the WIP, in 2014, the MDE issued to the Counties MS4 permits "requiring compliance with the Chesapeake Bay [total maximum daily load] through the use of a strategy that calls for the restoration of twenty percent of previously developed impervious land with little or no controls within this five[-]year permit term as described in" the WIP. MDE, National Pollutant Discharge Elimination System Municipal Separate Storm Sewer System Discharge Permit [for Carroll County] at 15, available at https://mde. maryland.gov/programs/Water/StormwaterManagementProgram/Documents/Carroll%20 Final%20Permit%20with%20attachments.pdf [https://perma.cc/FL5D-6UPU]; MDE, National Pollutant Discharge Elimination System Municipal Separate Storm Sewer System Discharge Permit [for Frederick County] at 15, available at https://mde.maryland.gov /programs/Water/StormwaterManagementProgram/Documents/Signed%20Frederick%20 Permit%20with%20Attachments.pdf [https://perma.cc/XC4Y-8EMY].

From my perspective, the MDE lacked the authority to require the Counties to restore 20% of the impervious surfaces throughout the entirety of each county; in other words, the Counties' MS4 permits simply require the Counties to restore 20% of the impervious surfaces in urbanized areas—*i.e.*, the areas that the Counties' MS4s serve. Just as the urbanized areas of each county determined whether the county's MS4 was small, medium, or large, see 40 C.F.R. § 122.26(b)(4)(i), (b)(7)(i); 40 C.F.R. Pt. 122, App. I, so, too, do the urbanized areas of each county determine the extent of the county's responsibility to restore 20% of impervious surfaces. It makes sense that each county

- 15 -

should be responsible only for restoring 20% of impervious surfaces in urbanized areas; in other words, the areas that each county's MS4 serves should be the same as the areas in which the county's MS4 permit makes the county responsible for restoring 20% of impervious surfaces.

In addition to improperly requiring the Counties to restore 20% of the impervious surfaces throughout the entirety of each county, the MDE misclassified the Counties' MS4s as medium rather than small. Generally, before October 1, 1994, the EPA and the MDE could "not require a permit . . . for discharges [that were] composed entirely of stormwater." 33 U.S.C. § 1342(p)(1). But, this exception to the permit requirement did not apply to "[a] discharge from a[n MS4] serving a population of 250,000 or more[,]" 33 U.S.C. § 1342(p)(2)(C), or "[a] discharge from a[n MS4] serving a population of 100,000 or more but [fewer] than 250,000[,]" 33 U.S.C. § 1342(p)(2)(D). An MS4 that serves a population of at least 250,000 is known as a "large" MS4, 40 C.F.R. § 122.26(b)(4)(i); an MS4 that serves a population of at least 100,000, but fewer than 250,000, is known as a "medium" MS4, 40 C.F.R. § 122.26(b)(7)(i); and, generally, an MS4 that is neither large nor medium is known as a "small" MS4, 40 C.F.R. § 122.26(b)(16)(ii). In short, "[p]ermits must be obtained for all discharges from large and medium [MS4]s." 40 C.F.R. § 122.26(a)(3)(i).

Whether an MS4 is large, medium, or small depends on the population of the incorporated place that the MS4 served according to the 1990 Decennial Census. See 40 C.F.R. § 122.26(b)(4)(i), (b)(7)(i). The EPA promulgated an appendix that listed the counties that, according to the 1990 Decennial Census, had "[u]nincorporated urbanized

population[s]" of at least 100,000, but less than 250,000.  See 40 C.F.R. Pt. 122, App. I. The only Maryland county that the appendix listed was Howard County.  See id.  In other words, according to the EPA, Howard County's MS4 was Maryland's only medium MS4. See id.

The Majority correctly observes that, in 1990, neither Carroll County nor Frederick County had a population of at least "100,000 in unincorporated, urbanized areas[,]" and that, accordingly, neither Carroll County nor Frederick County "likely met the EPA's contemporaneous interpretation of the medium [MS4] category[.]"  Maj. Slip Op. at 85 (cleaned up).  Yet, the Majority "decline[s] to hold that[,] today, . . . the Counties should instead be" considered to have had small MS4s.  Id. at 85-86.  I am unpersuaded by the reasons that the Majority gives for declining to right the wrong that has evidently occurred—namely, the misclassification of the Counties' MS4s as medium rather than small.  See id. at 85-89.  Nor would I find merit in the MDE's contentions, such as its argument that the Counties are equitably estopped from challenging the misclassification. In my view, the Counties' mere "acquiesce[nce]" to the misclassification, id. at 89, is neither a reason to refrain from addressing the merits of their contention, nor a basis for concluding that the MDE properly exercised its authority to classify the Counties' MS4s as medium.  The MDE, not the Counties, has been in the driver's seat when it comes to classification and permitting.  If there is any question as to whether a misclassification has occurred, the fault lies with the MDE, not the Counties.

Without a doubt, government protection of the environment has a sustaining and welcome purpose.  Indeed, protecting and fostering the health of the environment is an

- 17 -

important goal in today's society, now more than ever. But, the government must follow the statutes and regulations that it establishes. Misapplication of environmental statutes and regulations serves no purpose and will result in diminishment of regard for the law.

For the above reasons, respectfully, I dissent.

Judge Hotten and Judge Getty have authorized me to state that they join in this opinion.

Circuit Court for Carroll County
Case No. 06-C-15-068141

Circuit Court for Frederick County
Case No. 10-C-15-000293

Argued: September 13, 2018

IN THE COURT OF APPEALS

OF MARYLAND

Nos. 5 & 7

September Term, 2018

—————————————————

MARYLAND DEPARTMENT OF THE
ENVIRONMENT
v.
COUNTY COMMISSIONERS OF CARROLL
COUNTY, MARYLAND

—————————————————

FREDERICK COUNTY, MARYLAND
v.
MARYLAND DEPARTMENT OF THE
ENVIRONMENT

—————————————————

Barbera, C.J.
*Greene
*Adkins
McDonald
Watts
Hotten
Getty,

JJ.

—————————————————

Dissenting Opinion by Getty, J.

—————————————————

Filed: August 6, 2019

*Greene and Adkins, JJ., now retired, participated in
the hearing and conference of this case while active
members of this Court; after being recalled pursuant
to the Maryland Constitution, Article IV, Section 3A,
they also participated in the decision and adoption of
this opinion.

I join the dissent written by Judge Watts and agree with her analysis that the Maryland Department of the Environment ("the Department") exceeded its authority by (1) issuing permit requirements that exceed the "maximum extent practicable" standard; (2) requiring the Counties to restore 20% of all impervious surfaces county-wide; and (3) classifying each County's municipal separate storm sewer system (MS4) as medium rather than small. Dis. Slip Op. at 1.

I write separately to express my concern with this Court's tradition of granting broad deference to an agency's interpretation of statutes and regulations. Under the facts of this case, I would scale back the agency deference doctrine as recognized in Maryland.

The Majority cites to *Chevron U.S.A. v. Nat. Res. Def. Council*, 467 U.S. 837 (1984), for the broad principle that this Court must defer to an agency's interpretation of its controlling statutes. However, in *Auer v. Robbins*, 519 U.S. 452 (1997), the Supreme Court held that deference is only owed to an agency's *reasonable* interpretations of its *ambiguous* regulations. At a minimum, I would adopt the constraints of *Auer* deference – that the agency's regulation be ambiguous and its interpretation reasonable to merit judicial deference. Absent such determinations, this Court has a duty to exercise its best judgment and resolve the issues at hand, else we "deny the people who come before us the neutral forum for their disputes that they rightly expect and deserve." *Kisor v. Wilkie*, 139 S. Ct. 2400, 2448 (2019) (Gorsuch, J., concurring).[1]

---

[1] In *Kisor v. Wilkie*, the Supreme Court clarified that *Auer* deference requires that (1) the regulation is "genuinely ambiguous"; (2) the agency's reading is "reasonable," or within the zone of ambiguity; and (3) the "character and context of the agency interpretation

The pressing need for such constraints is best illustrated by the Majority's deference to the Department's improper classification of each County's MS4 as medium rather than small. The Clean Water Act and its corresponding regulations are not ambiguous—in fact, the Majority has already acknowledged that "neither County likely met the EPA's contemporaneous interpretation of the medium category," under "the EPA's interpretation of its own regulations." Maj. Slip Op. at 85. Rather than correct this error, the Majority upholds a flawed agency decision that has subjected two rural counties to a burdensome regulatory scheme intended for densely populated jurisdictions such as Montgomery County and Baltimore City.[2]

As described by the Majority, the Water Quality Act of 1987 extended the Clean Water Act's effluent permit requirements to encapsulate point-source pollution contained in municipal stormwater. *Nat'l Res. Def. Council, Inc. v. EPA*, 966 F.2d 1292, 1296 (9th Cir. 1992). The Act proscribed a timetable for the implementation of these requirements, proceeding in two phases based on the size and perceived impact of each stormwater system. 33 U.S.C. § 1342(p)(2)-(4). As relevant, between 1987 and 1994 ("Phase I" of

entitles it to controlling weight." *Id.* at 2414-16 (2019). As *Kisor* was decided on July 26, 2019, it was not briefed or argued by either party. I include it in this dissent not as controlling precedent, but to further illustrate the contours of *Auer* deference, and to highlight the persuasive concurrence calling for a more constrained, moderated view of agency deference.

[2] The EPA promulgated its Phase I implementing regulations in 1990 with the intent of regulating MS4s servicing "urbanized" areas, characterized by the Census Bureau as "high-density development . . . a central city (or cities) with a surrounding closely settled area." *See* EPA, *National Pollutant Discharge Elimination System Permit Application Regulations for Storm Water Discharges*, Final Rule, 55 Fed. Reg. 47990, 48041, 48050 n.5 (Nov. 16, 1990).

the permitting program) state agencies could only require permits for MS4s that (1) serve a population of 250,000 or more (a "large MS4"); (2) serve a population of more than 100,000 but less than 250,000 (a "medium MS4"); or (3) are designated "a significant contributor of pollutants to waters of the United States." § 1342(p)(2)(C)-(E). The substantive requirements contained in MS4 permits were left entirely to the discretion of the EPA and state regulatory bodies. *See* § 1342(p)(3)(B) ("Permits for discharges from municipal storm sewers . . . shall require controls to reduce the discharge of pollutants . . . as the Administrator or the State determines appropriate").

The EPA has issued implementing regulations to further define its Phase I classifications. Rules promulgated in 1990 governing Phase I permits establish that the "medium" category encompasses (i) MS4s serving between 100,000 and 250,000 people in an incorporated municipality; and (ii) a list of jurisdictions enumerated in Appendix I of the regulatory text.[3] 40 CFR § 122.26(b)(7)(i)-(ii). In 1999, once all permitting deadlines had passed, the EPA elected to freeze these classifications based on each jurisdiction's population as reported in the 1990 census. EPA, *National Pollutant Discharge Elimination System – Regulations for Revision of Water Pollution Control Program Addressing Storm*

---

[3] Appendix I listed counties with at least 100,000 people in *urbanized unincorporated areas*, a threshold satisfied by neither County. As of the 1990 census, Frederick County had a total population of 150,208 with only 58,393 residing in urbanized areas – while Carroll County was home to 123,372 people, with no urbanized population. *See* Maryland Department of Planning, *Urban and Rural Population in Maryland: 2000 and 1990* (May 2002), *available at:* http://planning.maryland.gov/MSDC/Documents/Census/Cen2000/urban_rural/ua_rural2 k_cnty.pdf

*Water Discharges*, Final Rule, 64 Fed. Reg. 68772, 68748-49 (Dec. 8, 1999).[4] These regulations contain "no minimum criteria or performance standards," instead encouraging the permitting agency to develop pollution controls for each permit on a case by case basis. *Nat'l Res. Def. Council*, 966 F.2d at 1308.

Under this statutory and regulatory framework, neither County satisfied the requirements for a "medium MS4" during the Phase I permit period. As acknowledged by the Majority, "neither County likely met the EPA's contemporaneous definition of the medium category," as neither County had a population of 100,000 in an incorporated area, and neither County was enumerated in Appendix I. Maj. Slip Op. at 85; *See Nat. Res. Def. Council, Inc. v. New York State Dep't of Envtl. Conservation*, 34 N.E.3d 782, 794 n.16 (N.Y. 2015) (holding that state agencies administering programs under the Clean Water Act are "bound to follow [the] EPA's interpretation"). Although the Department may, notwithstanding population, designate jurisdictions as "significant contributor[s] of pollutants to the waters of the United States," contemporaneous reports and correspondence by the Department demonstrate that the Counties were classified based solely on their projected population growth.[5] Therefore, by nonetheless requiring permits

---

[4] As the EPA suggested in the preamble to its 1999 regulations, state agencies may use their residual designation authority to "require more from operators of MS4s serving 'newly over 100,000' populations." *Id.* at 68749. This commentary does not expand the scope of the residual authority, which remains predicated on the determination that "storm water discharge from the source contributes to a violation of a water quality standard or is a significant contributor of pollutants to the waters of the United States." *Id.* at 68781.

[5] These reports and correspondence are detailed in appendices to the parties' briefs. *See, e.g.,* MDE, *Basis for Final Determination to Issue Frederick County's NPDES MS4 Permit*

of both Counties during Phase I, the Department contravened the unambiguous requirements of the Clean Water Act.

No statutory, regulatory, or judicial authority requires we adhere to this result. Contrary to the assertions of the Department and the conclusion of the Majority, reclassification would not implicate the anti-backsliding provision of the Clean Water Act. *See* 33 U.S.C. §1342(o)(1) ("[A] permit may not be renewed, reissued, or modified . . . to contain effluent limitations which are less stringent than the comparable effluent limitations in the previous permit"). This provision is inapplicable, as the Act contains an explicit exception for permits issued on the basis of "technical mistakes or mistaken interpretations of law." 33 U.S.C. §1342(o)(2)(b)(ii). Absent the legally inaccurate designation of Carroll and Frederick County stormwater systems as "medium MS4s," the Department would not have been authorized to require a permit of either County during the Phase 1 period. *See* 33 U.S.C. §1342(p)(1) (providing that, beyond the MS4 categories enumerated in §1342(p)(2), "the Administrator or the State . . . shall not require a permit under this section for discharges composed entirely of stormwater").

Similarly, the Counties' "acquiescence" to their MS4 classification is entirely irrelevant to the question of reclassification. The Majority relies heavily on the notion that the Counties have operated within the Phase I permitting program for three decades without

---

at 30 (Dec. 2014) ("MDE did not make a claim under its RDA [residual designation authority] that Frederick County must apply as a Phase I. . . . MDE had no need to . . . make a determination based on water quality violations or impairments"); MDE, *Maryland's NPDES Municipal Stormwater Monitoring* at 1 (1997) ("MDE used projections from the Maryland Office of Planning (MOP) to designate Carroll, Charles, Washington, and Frederick counties when their populations surpassed 100,000").

protest. *See* Maj. Slip Op. at 88-9 (reasoning that the Counties "have at the very least acquiesced [to Phase I] classification since the 1990s;" that "neither County (nor apparently anyone else) questioned the method that the Department used to assess the relevant population;" and that their acquiescence "may have foreclosed any need to invoke the Department's residual designation authority"). In the 1990s, the Counties dipped their toes in the water, so to speak, with the altruistic goal of doing their fair and proportionate share to achieve Maryland's clean water objectives. Their agreement and voluntary participation in the permitting program has no bearing on whether their classification was ever correct, as the Clean Water Act outright prohibited states from requiring a Phase I permit of jurisdictions that do not meet the requirements of §1342(p)(2). Moreover, no established precedent suggests that historical acquiescence or administrative reliance have foreclosed the Counties' right to challenge their designation.[6]

Lacking any legal justification for refusing the Counties' request for reclassification, the Majority nonetheless defers to the *post hoc* judgment of the EPA, concluding that "the agencies charged with administering the Clean Water Act have consistently regarded the

---

[6] This argument appears to implicitly evoke the Department's claim of equitable estoppel. MDE insists that Maryland's Watershed Improvement Plan (WIP) relies on the Counties' Phase I commitments. Equitable estoppel results from (1) a party's voluntary action, (2) inducing good faith reliance, (3) resulting in a detrimental change in position. *Permanent Fin. Corp. v. Montgomery Cty.*, 308 Md. 239, 247 (1986). At a very minimum, the Department has not suffered a detrimental change in position, as the Counties are on track to meet their Phase I commitments during the current permit cycle. *E.g.* Carroll County, *2017 NPDES MS4 Permit Annual Report* at 10 (Dec. 15, 2017), *available at* http://ccgovernment.carr.org/ccg/npdes/2017_NPDES_Annual_Report.pdf. Moreover, any reliance was arguably in bad faith, as the Department, not the Counties, is responsible for interpreting its governing regulations.

Counties as Phase I MS4s and that there is a reasonable basis for doing so." Maj. Slip Op. at 89. Granting an agency controlling authority over the interpretation of its own governing regulations amounts to an abdication of this Court's essential duty to interpret and apply the law. *See* Kisor, 139 S. Ct. at 2425 (Gorsuch, J., concurring) (arguing deference "requires judges to accept an executive agency's interpretation of its own regulations even when that interpretation doesn't represent the best and fairest reading").

Such absolute deference is improper even under the Majority's stated standard of review. Although an agency's factual findings are entitled to deference when supported by "substantial evidence," *Md. Dep't of the Env't v. Anacostia Riverkeeper*, 447 Md. 88, 120 (2016), the Majority openly acknowledges that the record contains "limited evidence of the Department's decision-making process in classifying these Counties as Phase I jurisdictions in 1991." Moreover, "it is always within our prerogative to determine whether an agency's conclusions of law are correct." *Schwartz v. Md. Dep't of Nat. Res.*, 385 Md. 534, 554 (2005); *See also Auer*, 519 U.S. at 461 (deference not warranted where agency interpretation is "plainly erroneous or inconsistent with the regulation."). The legal sufficiency of the Counties' Phase I permits, governed entirely by the Clean Water Act and its corresponding regulations, falls squarely within the purview of this Court.[7]

---

[7] The substantive terms of an MS4 permit are at the discretion of the Department, and therefore subject to an "arbitrary and capricious" standard of review. *See Harvey v. Marshall*, 389 Md. 243, 296-99 (2005). The Majority fails to identify any rational basis for tying pollution controls categorically to the scheduling requirements of the Clean Water Act—for example, requiring all Phase I counties to restore 30% of their total surface area by 2019, while requiring Phase II counties to restore 20% of their *urbanized* area by 2025. Rather, as discussed *supra*, the Clean Water Act and EPA regulations encourage states to

- 7 -

Applying *Auer* deference, an agency's interpretation of its own regulations is only entitled to deference "if [the] regulation is genuinely ambiguous . . . even after a court has resorted to all the standard tools of interpretation." *Kisor*, 139 S. Ct. at 2414. "[I]f the law gives an answer—if there is only one reasonable construction of a regulation—then a court has no business deferring to any other reading, no matter how much the agency insists it would make more sense." *Id.* at 2415. Nowhere does the Majority identify any ambiguity in the plain language of the Clean Water Act or the implementing regulations promulgated in 1990 and 1999. Rather, as the Majority acknowledges, the law provides a clear answer: Neither County's population, as reported in the 1990 Census, authorized their classification as "medium" MS4s under established law.

Allowing the Department to issue Phase I permits notwithstanding would "permit the agency, under the guise of interpreting a regulation, to create *de facto* a new regulation." *Id.* (quoting *Christensen v. Harris County*, 529 U.S. 576, 588 (2000)). Moreover,

> [w]hen we defer to an agency interpretation that differs from what we believe to be the best interpretation of the law, we compromise our judicial independence and deny the people who come before us the impartial judgment that the Constitution guarantees them. And we mislead those whom we serve by placing a judicial *imprimatur* on what is, in fact, no more than an exercise of raw political executive power.

*Kisor*, 139 S. Ct. at 2439 (Gorsuch, J. concurring).

In the simplest terms, the Majority acknowledges that the Department's construction

---

develop substantive permit terms on a case by case basis. *See* 33 U.S.C. § 1342(p)(3)(B); *Nat'l Res. Def. Council*, 966 F.2d at 1308.

of its unambiguous regulatory mandate was incorrect, finds little evidence on record to support this interpretation, identifies no legal authority that bars judicial review, and yet defers regardless. By nonetheless "affording 'controlling weight' to [the Department's] post-promulgation views" of its governing regulations, our ruling today perpetuates a longstanding inequity, and risks foreclosing judicial review to litigants seeking to challenge administrative overreach. *Id.* at 2446 (Gorsuch, J. concurring).

For the foregoing reasons, I respectfully dissent.